# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70844-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED IN PART OPINION |
| | ) | |
| JOSHUA DAVID LAMBERT, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 22, 2017 |

SCHINDLER, J. — Joshua David Lambert has a history of fixating on guns while using methamphetamine. Armed with a knife on October 3, 2011, Lambert went to the house of his 80-year-old paternal grandfather George Lambert to steal guns. Lambert assaulted and brutally murdered his grandfather, tied up his 66-year-old great-aunt, and stole her car. Lambert drove to his mother's house to steal guns. Lambert confronted his 80-year-old maternal grandfather August Eisner in the driveway and demanded the keys to the garage that contained a gun safe. When Eisner refused to give him the keys, Lambert brutally murdered him. Before he was arrested, Lambert went to the apartment of an acquaintance to steal a weapon. A jury convicted Lambert of two counts of premeditated murder and felony murder in the first degree predicated on burglary in the first degree, three counts of burglary in the first degree, kidnapping in the first degree, taking a motor vehicle without permission in the second degree, and

unlawful possession of a firearm in the second degree. Murder in the first degree and burglary in the first degree are alternative means crimes. The court instructed the jury that it need not unanimously agree on the means. Where sufficient evidence supports each of the alternative means of committing a crime, jury unanimity is not required. But where insufficient evidence supports one of the alternative means, the conviction cannot stand. Lambert contends insufficient evidence supports the felony murder convictions of George Lambert and August Eisner predicated on burglary in the first degree. Lambert also argues the to-convict jury instructions on felony murder omitted an essential element, the murder in the first degree and burglary in the first degree convictions violate double jeopardy, the court violated his constitutional right to represent himself, and the court erred by ruling on his motion to acquit by reason of insanity at the end of trial. Because insufficient evidence supports the felony murder conviction of August Eisner predicated on burglary in the first degree of the residence of Lambert's mother and stepfather, we reverse the felony murder conviction of Eisner and burglary in the first degree of the residence of Lambert's mother and stepfather. On remand, the State may retry Lambert on only premeditated murder in the first degree and burglary in the first degree on the deadly weapon prong. In all other respects, we affirm.

## FACTS

Joshua David Lambert is the son of Rick Lambert and Susan Lambert and the father of S.L. Lambert has a history of using methamphetamine. In 2001 and 2002, Lambert was convicted of unlawful possession of methamphetamine. When S.L. was 3-years-old, the court appointed Susan Lambert and her spouse James Coffin as the legal

guardians of S.L. In 2005, Lambert moved to Alaska. In March 2006, Lambert was convicted of assault in the third degree. In October or November 2010, 29-year-old Lambert returned from Alaska to live with his mother, stepfather, and 12-year-old S.L. at their residence on Hastie Lake Road in Oak Harbor, Washington. Lambert lived in a van parked in the driveway.

In spring 2011, Susan Lambert and Coffin suspected Lambert was using drugs and were concerned about the safety of S.L. Coffin was also concerned for his own safety and "started keeping a gun in the house" and "would wear it in the house . . . until Susie came home." Coffin owned several guns that he kept locked in a gun safe in the garage.

After a fight with a neighbor, Susan told Lambert he had to leave. Coffin testified Lambert's "drinking had escalated to violence, and we couldn't have him on the property . . . once he was doing violent things." Lambert sold the van and lived in a tent in a heavily wooded area located approximately 100 yards from the Hastie Lake Road residence.

When Lambert used methamphetamine, he became paranoid, fixated on guns, and engaged in " 'gun-searching behavior.' " On October 2, 2011, Lambert stole a 12-gauge shotgun that belonged to Coffin from the garage. Lambert "sawed the shotgun off," removed the serial number, and hid the gun in the woods.

The next day on October 3, Lambert could not remember where he hid the shotgun. Lambert decided to walk to his uncle Jeffrey Lambert's house to "steal guns." Because "there appeared to be a whole bunch of people" at the house, Lambert decided to go to his paternal grandfather's house on Oldenburg Lane in Oak Harbor to

3

steal guns.

Eighty-year-old George Lambert lived with his 66-year-old sister Kay Gage at the house on Oldenburg Lane. After he suffered a "major stroke" in 2005, George had significant "mobility issues" and used a "lift chair." Lambert and his grandfather had a close relationship. Lambert would often visit his grandfather and help do yard work.

Lambert arrived at the house at approximately 2:30 p.m. Lambert carried a folding knife in his pocket. Gage was in the driveway loading her car with items from the garage to take to storage. Gage told Lambert his grandfather was in the living room doing crossword puzzles. Lambert entered the house through the front door and immediately locked the door behind him. George Lambert was standing in front of his lift chair in the living room.

Lambert was on a " 'mission' " to get a gun and confronted George. Lambert said, " 'I put the knife in his face, which is the universal term for freeze. And . . . he wasn't scared at all. . . . Not one bit of fear were in his eyes at all.' " Lambert said George " 'charged' " at him and they fought and struggled. Lambert stabbed George in the throat, nearly severing his tongue. Lambert stabbed George in the chest 27 times.

Lambert grabbed Gage as she entered the house from the garage. Lambert took her cellphone, pushed her into the living room, hit her on the head, and bound her wrists and ankles with packing tape. Lambert demanded Gage tell him "where the guns were." Gage knew George kept a gun under his bed but did not tell Lambert about the gun or that she and George switched bedrooms. Lambert "started going through the house and yelling and tearing things . . . out of closets." Gage said when Lambert "couldn't find the weapons," she recalled seeing "two guns that were . . . in the

4

garage. . . . [A]n air gun and a BB[1] gun." Gage told Lambert she "remembered . . . [t]here were rifles in the garage." Lambert demanded Gage give him the keys to her car. After finding " 'the pellet rifle' " and ammunition in the garage, Lambert left.

Lambert drove to his mother's house on Hastie Lake Road because he "knew there were guns there." Susan Lambert's 80-year-old father August Eisner lived in an apartment above the garage. Lambert searched the house for firearms. While he was in the bedroom, Lambert saw his grandfather outside in the driveway. Lambert left the house and confronted Eisner in the driveway. Lambert told Eisner he " 'needed the key' " to the garage because " 'the garage was locked' " and there were " 'guns and the cases in the garage.' " Eisner refused to give him the keys to the garage. According to Lambert, Eisner " 'said, "No. You're not allowed in the garage." ' " Lambert " 'put the knife in his face' " and Eisner lunged at him. Lambert stabbed Eisner in the neck, severing his carotid artery. Lambert stabbed Eisner in the back 21 times. Lambert took the garage keys from Eisner's pocket but he could not open the gun safe.

Lambert drove to the apartment of an acquaintance, Amber McCabe. When McCabe retuned from visiting a neighbor, she found Lambert inside holding her hunting bow. McCabe demanded he leave. Lambert "said that the police were looking for him." Lambert dropped the bow and left. As Lambert was leaving, McCabe "noticed some needles — Yellow with oranges [sic] caps on the ends of them — he had in his pocket."

Oak Harbor Police Department officers arrested Lambert later that day. Officer Robert Mirabal found a hypodermic needle in Lambert's jacket pocket and a "[s]mall plastic bag" of white powder in his pants pocket.

---

[1] Ball bearing.

5

The State charged Lambert with premeditated murder and felony murder in the first degree predicated on burglary in the first degree of George Lambert, count I; premeditated murder and felony murder predicated on burglary in the first degree of August Eisner, count II; kidnapping in the first degree of Kay Gage, count III; burglary in the first degree of the residence of George Lambert and Kay Gage, count IV; taking a motor vehicle without permission in the second degree, count V; burglary in the first degree of the residence of Susan Lambert and James Coffin, count VI;[2] burglary in the first degree of the residence of Amber McCabe, count VII; and unlawful possession of a firearm in the second degree, count VIII. The State alleged a deadly weapon enhancement and a number of aggravating factors.

At the arraignment on October 17, 2011, Lambert told the court he wanted to represent himself at trial. Following an extensive colloquy, the court found Lambert knowingly, intelligently, and voluntarily waived his right to counsel and granted his request to represent himself. Lambert entered a plea of not guilty. On November 21, the court appointed standby counsel to assist Lambert in preparing for trial.

On February 6, 2012, Lambert sent a five-page handwritten confession to Detective Cecil Wallace. Lambert admits he killed George Lambert and August Eisner and " 'detain[ed]' " Kay Gage. Lambert states that he " 'thought, due to insanity, that [S.L.]'s life was in danger.' "

On February 8, 2013, the State filed a motion for a competency evaluation of Lambert. The court ordered a competency evaluation. On February 27, Western State Hospital psychiatrist Dr. Ray Hendrickson issued a 15-page forensic mental health

---

[2] In addition to the residence, the information also charged Lambert with burglary in the first degree of "outbuildings." But the to-convict jury instruction refers to only "the residence" of Susan Lambert and James Coffin.

evaluation. Dr. Hendrickson states Lambert has a history of substance dependence and "an acknowledged history of significant and continuing drug abuse." But Dr. Hendrickson concluded his reported symptoms were "feigned."

> Most of [Lambert's] currently related symptoms of a psychotic nature, if credible, are atypical and infrequently reported symptoms and symptom combinations, and represent possible feigned attempts to present with symptoms of a mental illness.

Dr. Hendrickson diagnosed Lambert with "Substance Abuse versus Dependence (alcohol, cannabis, amphetamines, cocaine, opiates, and hallucinogens)."

> [E]ven if Mr. Lambert's expressed psychotic symptoms are genuine, they did not appear to interfere in any significant manner with his ability to function, or his ability to have a rational understanding of the court proceedings or to work with his standby attorney.

Lambert filed a motion to obtain a second competency evaluation by Dr. Lawrence Wilson. On March 5, the court authorized the second competency evaluation. Dr. Wilson issued a report on April 16. Dr. Wilson states that although Lambert "has some deficits," his "numerous fantasy-like claims . . . add up . . . to embellishment and exaggeration of whatever psychotic experiences he had in Alaska and upon returning to Washington."[3] Dr. Wilson concluded Lambert was competent to represent himself at trial.

> In this case, it is my best judgment that Mr. Joshua Lambert has the Factual and Rational Understanding that is necessary to serve as his own defense counsel, and to make decisions on his own behalf. I have come to this conclusion after careful review of the case documents, an interview of adequate length of time with Mr. Lambert, and have consulted with

---

[3] The report states:

Mr. Lambert certainly has some deficits, but the numerous fantasy-like claims of incessant voices, directions from them on a frequent and urgent basis, and directions to assassinate large numbers of people, in total seem to add up almost certainly to embellishment and exaggeration of whatever psychotic experiences he had in Alaska and upon returning to Washington.

some of the recent forensic psychiatry thinking on the topic, and make this opinion to the best of my ability.[4]

The court held a competency hearing on April 26. Lambert disagreed with both competency evaluations and asserted Dr. Wilson "lie[d]" in his report. The court concluded Lambert was competent to stand trial and represent himself.

> The defendant, in his present mental state, does possess the basic and fundamental capacity to understand the nature of the charge against him and does possess the basic fundamental capacity of [sic] participate in his own defense.

The court entered detailed findings of fact and conclusions of law.

On June 6, Lambert filed a motion "to set a hearing for the defendant to move for an acquittal based on insanity." The State filed a motion to defer ruling on Lambert's motion to acquit until after the experts testified at trial. The court granted the State's motion.

The jury was empaneled and the two-week trial began on July 10, 2013. Lambert reserved opening statement until the defense case. The State called a number of witnesses in its case-in-chief, including Kay Gage, Susan Lambert, James Coffin, Amber McCabe, the Island County Coroner, Washington State Patrol Crime Lab (WSPCL) forensic scientists, and police officers and detectives.

Lambert stipulated that he had previously been convicted of a felony. The police testified they found the shotgun Lambert stole from Coffin on October 2, 2011, in the woods near the residence on Hastie Lake Road.

Gage testified that her brother George and Lambert had a very close relationship. George "loved [Lambert] to death" and "would have done anything for him." Gage said George and Lambert "enjoy[ed] each other's company." Lambert often

---

4 Boldface omitted.

came to the house to "visit" George and was always "welcome."

> Q  Was he there to visit you or to visit your brother?
> A  To visit my brother. I tended to leave the room so they could visit. He wasn't there to see me. So I just went either to my room or, you know, outside or something.

Gage testified that on October 3, 2011, Lambert asked her where his grandfather was and started to enter the house through the garage. Gage stopped him and said, " 'Honey, go through the . . . front door. He's in the living room.' " Gage testified that 5 to 10 minutes later, she entered the house through the garage. Gage testified that Lambert hit her on the head, bound her wrists and ankles with tape, demanded she tell him where the guns were located, and drove away in her car.

Coffin testified Lambert was "allowed in the house" only "when his mother was home." Coffin testified he kept his guns in a locked gun safe in the garage. Coffin said he installed a deadbolt on the garage door and "always" kept the door locked "specifically . . . to keep [Lambert] out of the garage." Coffin testified that when he arrived home from work on October 3, he saw Eisner on the ground in the driveway with a "large gash on his throat that had bled dry."

WSPCL forensic scientist Daniel Van Wyk testified that the white powder the police seized from Lambert's pocket was a substance "very frequently [used] as a cutting agent for methamphetamine," dimethyl sulfone.

WSPCL forensic scientist Mariah Low testified there were "blood stain swipes" on the garage door of the Hastie Lake Road residence. Low testified there was blood on a light switch inside the garage and "bloody shoe prints or boot prints" on the garage floor. There were bloodstains on the door of the main residence and "bloody footwear impressions also at the base of the door." Low described "blood marks that go around a

kitchen area and then up the stairs into a bedroom."

Susan testified that Lambert called her several times on October 3, 2011. The first call was at 7:30 a.m. Lambert wanted to talk to S.L. Susan Lambert told him S.L. "didn't want to talk to him." The next call was "shortly after 2:30." Susan Lambert said she "noticed . . . it was Aunt Kay's number" but when she answered, "it was [Lambert]." Susan asked Lambert if he was over at the house helping his grandfather George.

> And when I answered, it was him. And I said, "Oh, well, hi." I said, "Are you helping Pops?"
> I assumed that he was over there and he asked to use her phone.
> . . . .
> You know, we talked about him helping Pops trim the fruit trees.
> And I — I made an assumption that that — that's what he was doing.

Susan said that during the conversation, she was not "alarmed at all by anything that was happening."

Island County Coroner Dr. Robert Bishop testified George Lambert suffered blunt force trauma to the face and stab wounds to the neck and chest. Dr. Bishop said George sustained "ecchymosis or bruising around the eyes from blunt force trauma. Layman's term would be black eyes." Dr. Bishop said George Lambert also showed signs of "[b]lunt force trauma all around both cheeks and the chin and mouth." Dr. Bishop testified the stab wound to the neck "transected" the carotid artery, "injured the jugular vein," and "half-transected" George's tongue. Dr. Bishop said the stab wounds to George's chest punctured his liver and lungs "multiple times."

Dr. Bishop testified August Eisner suffered a stab wound to his neck that "completely transected and. . . exposed" the carotid artery and multiple stab wounds to the back. Dr. Bishop testified that an individual with a severed carotid artery can "have as much as 20, 25 seconds of consciousness." Dr. Bishop estimated that Eisner died at

approximately 3:00 p.m. on October 3.

The court admitted into evidence recordings of several conversations between Lambert and his mother while Lambert was in jail. The State played portions of the recorded conversations for the jury. On October 8, 2011, Susan tells Lambert that "they know you were on something" and asks him what he was "on." Lambert replies that he "can't talk about too many details of the case" and changes the subject. Later in the conversation, Lambert describes the "whole day" as a "trip." Lambert tells Susan he does not "know how I got to that point." Susan responds, "Drugs."[5]

In an October 14 phone call, Lambert tells Susan Lambert there is "a dirty needle" in a duffle bag on the side of her house and asks her to throw it away. In an October 19 recording, Lambert tells Susan Lambert he repeatedly stabbed George Lambert and August Eisner "because they weren't dying right away" and he "was trying to get them to die."

> SUSAN LAMBERT: . . . The coroner's report says you stabbed each grandpa at least 30 times.
>
> . . . .
>
> JOSHUA D. LAMBERT: Well, actually, that was because they weren't dying right away. And I couldn't stand to sit there and watch them slowly die. That's why I— That's why I kept stabbing them. Because I never killed anybody before. I don't know how.
>
> That's why— I slit their throat, but they won't— When they're in the movies, you slit their throat, they drop down dead right away.
>
> They weren't dropping down dead. They're sitting there looking up at me, moving around. Ah. And it's - it's - it's— It is horrible.
>
> . . . .
>
> That's why— That's why there's so many stab wounds. Because I

---

[5] The recording states, in pertinent part:
> JOSHUA D. LAMBERT: I don't know how I got to that point. I don't know how I got to that point in the first place.
> SUSAN LAMBERT: Drugs.
> JOSHUA D. LAMBERT: (Long pause.)
> SUSAN LAMBERT: Are you there?
> JOSHUA D. LAMBERT: Yeah, I'm here.

was trying to get them to die; not - not sit there slowly die. Not sit there slowly in pain.

The court admitted into evidence Lambert's five-page handwritten confession. Detective Wallace read the handwritten confession Lambert sent to him to the jury. Lambert states killing George Lambert and August Eisner was " 'the fastest way to a firearm.' " Lambert states that " 'due to insanity,' " he believed S.L's life was in danger.[6] Lambert admits stabbing George to death[7] and says he stabbed Eisner in the driveway because he would not provide the key to his mother's garage. Lambert states he would have " 'killed just about anybody to arm myself.' "

> "I don't want you to think hallucinations ordered me to kill my grandpas. It was, honestly, the fastest way to a firearm to save [S.L.].
> "If it was somebody in the way of a firearm, . . . I'd have killed them if I thought they were jeopardizing the safety of [S.L.] in the situation. I'd have killed just about anybody to arm myself to save [S.L.] from this torturous death."

In his opening statement, Lambert told the jury the evidence would show that on October 3, 2011, he was "legally insane."

Lambert testified he took methamphetamine intravenously and kept needles at Susan Lambert's house. Lambert said he hears voices "pretty much constantly" and was "in some form of hallucination during the murders." Lambert described previous hallucinations and the hallucinations he experienced on the day of the murders in detail.

Lambert testified that on October 3, he went to his uncle Jeffrey Lambert's home "and tried to steal guns there" but left because there would be "[t]oo much resistance"

---

[6] " 'I thought, due to insanity, that [S.L.]'s life was in danger. I also thought [S.L.] was going to be tortured. In fact, there were times I actually heard [S.L.] being tortured over the walkie-talkie and phone.' "

[7] " 'If Kay was gone, it would have been easier because since [George] is 80-years old, I probably could have put him in a choke hold or something. But that would have taken too long. And Aunt Kay would of called the cops.' "

and he "wouldn't have been successful."

Lambert said he took a bus to his grandfather George Lambert's house. Lambert testified he "was planning on breaking in" and "was going there . . . to steal a gun." Lambert said he tried to tie up George but stabbed him because "[t]here was some resistance." Lambert admitted he already had his folding knife "open in my pocket" when he entered George Lambert's house. Lambert said the first wound to George "wasn't aimed at anything" and "couldn't have been lethal really," but the "other ones were aimed at the veins" and "cutting someone's throat" with a knife is a fatal wound.

Lambert testified that he drove his great-aunt's car to his mother's house on Hastie Lake Road. Lambert said he searched the house "trying to find a gun." Lambert said that while he was inside the house, he saw his grandfather August Eisner in the driveway.

> Q    Did he come down the stairs while you were out in the
> driveway or where did you meet?
> A    I was in my mom's room and I seen him out the window.
> Q    So you had already— You were in the main house?
> A    (Nods.)

Lambert testified he was still carrying the same knife that he used to kill George Lambert. Lambert testified that when he confronted Eisner, he "put the knife . . . on him . . . to get him to freeze." But Eisner "jerked his arms up really fast."

On cross-examination, Lambert admitted he had a fascination with guns when he used methamphetamine. "I liked to clean [guns] when I was on meth. So when I was doing meth, I - I would have [guns] out all tooken [sic] apart and stuff." Lambert said he "would bring [guns] out and load them sometimes when I was on meth" because he "would get paranoid on meth."

13

Lambert called several police officers to testify as well as defense psychologist Dr. Robert Deutsch, Dr. Wilson, and Island County Coroner Dr. Bishop.

Dr. Deutsch testified that in his opinion, Lambert was "suffering from a long-standing, deeply ingrained psychotic disorder." Dr. Deutsch said that on October 3, 2011, Lambert "was in the throes of an intense paranoid delusional system." According to Dr. Deutsch, Lambert became "obsessed" with a "paranoid delusion that [S.L.] had been kidnapped." But Dr. Deutsch admitted Lambert was "overemphasizing or embellishing or exaggerating, misrepresenting" his symptoms. Dr. Deutsch testified that on October 3, 2011, Lambert knew what "the law of the land was, but . . . he believed that the law was suspended for him." Dr. Deutsch said that in his opinion, Lambert "believed he was doing the morally right thing."

Dr. Wilson testified he was "quite interested and amazed" by how much Lambert had learned about mental health issues. Dr. Wilson said Lambert did "a good bit of study" and read multiple Internet articles and a forensic psychiatry journal. Dr. Wilson stated that the symptoms Lambert reported during his competency evaluation were " 'not typical of usual schizophrenic hallucinations and delusions' " and could be " 'faked.' "

> "Many of his reported symptoms are clearly psychotic in nature, but are not typical of usual schizophrenic hallucinations and delusions. For example, schizophrenic hallucinations do not usually manifest such a vast range of voices that command the afflicted person to perform such a wide range of actions mainly of a violent and/or shocking nature. These could represent a faked attempt to exaggerate the experience he had during his earlier brief psychotic episodes with methamphetamine or psychedelic drugs or flagrant sham symptoms of how he presumes severe mental illness is actually experienced by an average person."

14

In rebuttal, the State called Western State Hospital forensic psychiatrist Dr. Margaret Dean and psychologist Dr. Brian Judd. Dr. Dean testified Lambert was probably in a "substance-induced psychotic episode" on October 3, 2011. Dr. Dean said substance-induced psychotic episodes "are not the result of a major mental illness, . . . but are solely the result of voluntary use of a drug." Dr. Dean concluded Lambert was "malingering," or intentionally "feigning or exaggerati[ng] or faking . . . mental health symptoms in order to obtain a certain definite goal." Dr. Dean described a number of reasons to support her conclusion that Lambert was malingering, including "repeatedly tr[ying] to control the content and process of the interviews" and reading from "copious notes" to describe the events of October 3 during interviews. Dr. Dean testified that it was her "medical opinion, to a reasonable degree of medical certainty, that Mr. Lambert does not qualify for an affirmative defense of being found not guilty by reason of insanity."

Dr. Judd testified that he diagnosed Lambert with an "[a]mphetamine-induced psychotic disorder with delusions with onset during withdrawal." Dr. Judd testified that psychiatric testing "came out very, very high indicating that [Lambert] was exaggerating symptoms." Dr. Judd stated Lambert was "endorsing .... symptoms that are seldom seen in genuinely psychiatrically impaired populations." Dr. Judd stated Lambert's former girlfriend, Jackie Wallace, described her "observations of [Lambert] using methamphetamine." Wallace told Dr. Judd that when Lambert " 'starts coming down from a meth binge, he would become paranoid and engage in gun-searching behavior. He would collect firearms.' " Dr. Judd testified that in his opinion, Lambert "was able to understand the nature and the quality" of his acts and "could tell right from wrong" on

15

the day of the murders.

At the conclusion of the evidence, the court ruled Lambert did not meet his burden to show he was not guilty by reason of insanity. The to-convict jury instruction on murder in the first degree states, in pertinent part:

> To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (2)(a) [(the defendant acted with premeditated intent)] or (2)(b) [(the defendant caused the death . . . [d]uring the course of, in furtherance of, or in immediate[ ]flight from the commission of burglary in the first degree)] has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

The jury returned a verdict finding Lambert guilty of murder in the first degree of George Lambert, murder in the first degree of August Eisner, kidnapping in the first degree of Kay Gage, burglary in the first degree of the residence of George Lambert and Kay Gage, taking a motor vehicle without permission in the second degree, burglary in the first degree of the residence of Susan Lambert and James Coffin, burglary in the first degree of the residence of Amber McCabe, and unlawful possession of a firearm in the second degree. By special verdict, the jury found Lambert was armed with a deadly weapon at the time he committed murder in the first degree of George Lambert and August Eisner, kidnapping Kay Gage, burglary in the first degree of the residence of George Lambert and Kay Gage, and burglary in the first degree of the residence of Susan Lambert and James Coffin. The jury returned a special verdict on a number of aggravating factors, including the victims were "members of the same family or household" and were "particularly vulnerable or incapable of resistance."

The court imposed an exceptional sentence of 1,200 months in prison.

## ANALYSIS

Felony Murder and Burglary in the First Degree Convictions

In Washington, premeditated murder and felony murder are alternative means of committing murder in the first degree. State v. Fortune, 128 Wn.2d 464, 468, 909 P.2d 930 (1996). To convict Lambert of murder in the first degree, the State had the burden of proving beyond a reasonable doubt that Lambert caused the death of another person (1) with premeditated intent or (2) during the course of, in furtherance of, or in immediate flight from the crime of burglary in the first degree. RCW 9A.32.030(1).[8]

Burglary in the first degree is an alternative means crime. State v. Williams, 136 Wn. App. 486, 498, 150 P.3d 111 (2007); State v. Irby, 187 Wn. App. 183, 198, 347 P.3d 1103 (2015). To convict Lambert of burglary in the first degree, the State had the burden of proving beyond a reasonable doubt that he unlawfully entered or remained in a building with the intent to commit a crime against property or a person, and while entering, remaining, or in immediate flight therefrom, he was armed with a deadly weapon or assaulted a person therein. RCW 9A.52.020(1);[9] see also Williams, 136 Wn. App. at 498 ("[B]urglary in the first degree may be committed in two different ways, either by being armed with a deadly weapon or by assaulting any person.").

---

[8] RCW 9A.32.030(1) states, in pertinent part:
A person is guilty of murder in the first degree when:
    (a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person; or
    . . . .
    (c) He or she commits or attempts to commit the crime of . . . burglary in the first degree . . . and in the course of or in furtherance of such crime or in immediate flight therefrom, he . . . causes the death of a person other than one of the participants.

[9] RCW 9A.52.020(1) states:
A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

Lambert does not challenge the convictions of premeditated murder in the first degree of George Lambert or August Eisner. Lambert contends insufficient evidence supports the felony murder convictions predicated on burglary in the first degree and the burglary in the first degree convictions of the residence of George Lambert and Kay Gage and the residence of Susan Lambert and James Coffin. Lambert contends the convictions violated his constitutional right to a unanimous jury verdict. WASH. CONST. art. I, § 21.

In State v. Woodlyn, ___ Wn.2d ___, 392 P.3d 1062, 1066 (2017), the Washington Supreme Court held that when there is sufficient evidence to support each alternative means in an alternative means conviction, there is no "categorical right to express unanimity (i.e., unanimity as to means)." See also State v. Sandholm, 184 Wn.2d 726, 732, 364 P.3d 87 (2015). Where sufficient evidence supports each of the alternative means of committing the crime, specificity as to which means is not required. State v. Armstrong, No. 93119-4, slip op. at 10 (Wash. May 11, 2017); Woodlyn, 392 P.3d at 1067. But where insufficient evidence supports only one of the alternative means and "the jury does not specify that it unanimously agreed on the other alternative, . . . the conviction cannot stand." Armstrong, No. 93119-4, slip op. at 10.[10]

Sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The State has the burden of proving the elements of a crime beyond a reasonable doubt. In re Winship,

---

[10] Armstrong states, in pertinent part:

Thus, as we have said before, an instruction on jury unanimity as to the alternative method found is preferable. [State v. ]Whitney, 108 Wn.2d [506, ]511[, 739 P.2d 1150 (1987)]. Giving such an instruction eliminates potential problems that may arise when sufficient evidence does not support one of the alternatives. [Whitney, 108 Wn.2d at 511]. But an instruction being preferable does not make it a requirement.

Armstrong, No. 93119-4, slip op. at 10-11.

397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002). Under the Sixth Amendment and the Fourteenth Amendment to the United States Constitution and article I, sections 21 and 22 of the Washington State Constitution, a criminal defendant is entitled to " 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " Apprendi v. New Jersey, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)[11] (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)); Jackson v. Virginia, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

In reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Witherspoon, 180 Wn.2d at 883. Circumstantial evidence and direct evidence are equally reliable. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883. Where sufficient evidence does not support a conviction, the conviction "cannot constitutionally stand." Jackson, 443 U.S. at 317-18.

---

[11] Alteration in original.

Felony Murder of George Lambert and Burglary in the First Degree of the Residence at Oldenburg Lane

Lambert contends insufficient evidence supports finding the predicate crime of burglary in the first degree and that he entered and remained unlawfully.[12] Lambert claims that because Gage invited him into the house, he did not enter or remain unlawfully in the residence. Gage testified that she told Lambert that George was in the house and to " 'go through the . . . front door. He's in the living room.' "

To convict Lambert of felony murder predicated on burglary in the first degree, the State had the burden of proving beyond a beyond a reasonable doubt that during the course of, in furtherance of, or in immediate flight from the commission of the burglary, he caused the death of George Lambert. RCW 9A.32.030(1)(c). To convict Lambert of burglary in the first degree, the State had the burden of proving that "with intent to commit a crime against a person or property," Lambert entered or remained "unlawfully in a building," and "in entering or while in the building or in immediate flight therefrom," he was "(a) . . . armed with a deadly weapon, or (b) assault[ed] any person." RCW 9A.52.020(1). A person "enters or remains unlawfully" when he is not "licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(2).[13]

The license to enter or remain may be limited as to time, place, or purpose and revoked. State v. Collins, 110 Wn.2d 253, 261, 751 P.2d 837 (1988). "[I]n some cases, depending on the actual facts of the case, a limitation on or revocation of the privilege to be on the premises may be inferred from the circumstances of the case." Collins, 110 Wn.2d at 261. In Collins, the Supreme Court held the determination of whether a

---

[12] We note that ample evidence supports both convictions for premeditated murder.

[13] The legislature amended RCW 9A.52.010 in 2016. LAWS OF 2016, ch. 164, § 12. Because the amendments do not change the definition of "enters or remains unlawfully," we cite the current statute.

defendant's presence becomes unlawful because of an implied limitation on, or revocation of, his privilege to be on the premises is decided on a case-by-case basis. Collins, 110 Wn.2d at 261-62.

Viewing the evidence in the light most favorable to the State, a jury could reasonably infer the invitation to Lambert to enter the house was limited to a single purpose—to visit his grandfather George Lambert. Gage stated George and his grandson "enjoy[ed] each other's company" and Lambert was "welcome at the house." Gage testified that when Lambert came to the house in the past, he came to "visit" George.

A jury could also reasonably infer that any invitation to enter and remain in the house was revoked when Lambert attacked George. In Collins, the victims let the defendant, a stranger, into their home to use the telephone and the defendant raped the victims. Collins, 110 Wn.2d at 254-55. The court concluded the license to enter was limited to a specific area and purpose. Collins, 110 Wn.2d at 261. When the defendant exceeded the limitation to place and purpose, his license to remain was implicitly revoked. Collins, 110 Wn.2d at 261. The court cited with approval an out-of-state case, Hambrick v. State, 174 Ga. App. 444, 330 S.E.2d 383 (1985), as an example of the rule. Collins, 110 Wn.2d at 261.

> "When [the defendant]'s ulterior purpose beyond the bounds of a friendly visit became known to [the victim], who was the source of the authority, and he reacted against it, a reasonable inference could be drawn that the authority to remain ended. [The victim] did not have to shout 'Get out!' for this to be so. Yet [the defendant] remained until he got possession of the money, far beyond the time at which the scope of the permission ended."

Collins, 110 Wn.2d at 261 (quoting Hambrick, 174 Ga. App. at 447).

21

Lambert testified that he shoved George into a chair, "put the knife on his face," and "tried to tie him up" before stabbing him to death. According to Lambert's written confession, his grandfather " 'fought like hell and for a very long time' " before Lambert murdered him.

Even if sufficient evidence supports finding the privilege to enter or remain was revoked, Lambert argues insufficient evidence supports the conviction of felony murder predicated on burglary in the first degree because there is no evidence that he murdered George Lambert in the course of or in furtherance of the burglary.[14]

In State v. Golladay, 78 Wn.2d 121, 470 P.2d 191 (1970), the court defined "in the course of" to require a causal connection such that the death was a probable consequence of the felony " 'committed in the course of the perpetration of another crime.' " Golladay, 78 Wn.2d at 130-31 (quoting State v. Diebold, 152 Wash. 68, 72, 277 P. 394 (1929)).

In State v. Hacheney, 160 Wn.2d 503, 518, 158 P.3d 1152 (2007), the court held that for a murder to occur "in the course of" committing the predicate crime of arson, the predicate crime must begin before the murder.

> A person is guilty of aggravated first degree murder if the murder was committed "in the course of" an enumerated felony, . . . not if the enumerated felony is committed in the course of the murder. . . . [F]or a

---

[14] RCW 10.95.020 states, in pertinent part:
A person is guilty of aggravated first degree murder, a class A felony, if he or she commits first degree murder as defined by RCW 9A.32.030(1)(a), . . . and one or more of the following aggravating circumstances exist:
. . . .
(11) The murder was committed in the course of, in furtherance of, or in immediate flight from one of the following crimes:
(a) Robbery in the first or second degree;
(b) Rape in the first or second degree;
(c) Burglary in the first or second degree or residential burglary;
(d) Kidnapping in the first degree; or
(e) Arson in the first degree.

killing to have occurred "in the course of" arson, logic dictates that the arson must have begun before the killing.

Hacheney, 160 Wn.2d at 518.[15]

Sufficient evidence supports the jury finding the burglary began before the murder and, therefore, the killing occurred in the course of or in furtherance of the felony.

Lambert said he was on a " 'mission' " to steal guns.

> [I]f nobody was there, I would not have had to hunt down the people that lived there and - and kill them. . . .
> . . . If . . . nobody was there, I . . . would have just had to have burglarized for - for the guns or gone in there or gone in there and tooken [sic] the guns.

The undisputed evidence establishes that Lambert went to George Lambert's house to steal guns. Lambert testified, "I rode the bus out towards my Grandpa George's house. Ah. I was planning on breaking in - or, I mean— I . . . was going there to - to steal a gun." Lambert admitted he had a folding knife "open in my pocket" when he entered the house and after entering the house, he locked the front door behind him " 'so it'd take Kay longer' " to get into the house. Once inside the house, he confronted George Lambert and "put the knife on his face." George Lambert " 'fought like hell and for a very long time' " and Lambert stabbed George to death when the struggle "escalated." We conclude sufficient evidence supports the felony murder conviction of George Lambert.

---

[15] (Emphasis in original.) In Hacheney, the Supreme Court notes a distinction between whether a killing occurs "in the course of" a felony and whether a killing occurs "in furtherance of" a felony. Hacheney, 160 Wn.2d at 518 n.6. The court states:

> This is not to say that a robber, for example, who kills his victim before committing the taking can necessarily avoid conviction for aggravated first degree murder. A killing to facilitate a robbery would clearly be "in the furtherance of" the robbery.

Hacheney, 160 Wn.2d at 518 n.6.

Irby is distinguishable. In Irby, there was overwhelming evidence that the defendant "committed the murder" but there was "no evidence" of the intent to commit burglary or that the burglary preceded the murder. Irby, 187 Wn. App. at 201-02.

Lambert also claims insufficient evidence supports the alternative means of committing the crime of burglary in the first degree of the residence of George Lambert and Kay Gage. Lambert does not dispute sufficient evidence supports the assault prong of burglary in the first degree. Lambert asserts insufficient evidence supports the deadly weapon prong. Lambert's argument is without merit.

As previously noted, burglary in the first degree can be committed in two ways—if the defendant commits an assault or if the defendant is armed with a deadly weapon. RCW 9A.52.020(1). A deadly weapon is any weapon that "under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). More than mere possession of a knife is required under RCW 9A.04.110(6). In re Pers. Restraint of Martinez, 171 Wn.2d 354, 366, 256 P.3d 277 (2011). Where the weapon is a knife, " 'there must be some manifestation of willingness to use the knife before it can be found to be a deadly weapon under RCW 9A.04.110(6).' " Martinez, 171 Wn.2d at 366 (quoting State v. Gotcher, 52 Wn. App. 350, 354, 759 P.2d 1216 (1988)).

The undisputed testimony established Lambert entered the house on Oldenburg Lane with the intent to commit burglary with his folding knife "open in my pocket" and manifested a willingness to use the knife as a deadly weapon. Viewing this evidence in the light most favorable to the State, a jury could reasonably find Lambert was armed with a deadly weapon when he entered and remained inside the residence.

Felony Murder Conviction of August Eisner and Burglary in the First Degree of the Residence of Susan Lambert and James Coffin

Lambert contends insufficient evidence supports the conviction of felony murder of August Eisner predicated on burglary in the first degree and burglary in the first degree of the residence of Susan Lambert and James Coffin. Lambert asserts there is no evidence he murdered August Eisner while unlawfully entering or remaining in the residence of Susan Lambert and James Coffin or in immediate flight therefrom.

The State has the burden of proving Lambert murdered August Eisner during the course of, in furtherance of, or in immediate flight from the commission of burglary in the first degree. The to-convict jury instruction for burglary in the first degree states the State must prove beyond a reasonable doubt that Lambert entered or unlawfully remained in "the residence of Susan Lambert and Jim Coffin" with intent to commit a crime against a person or property and "[t]hat in so entering or while in the building or in immediate flight from the building the defendant was armed with a deadly weapon or assaulted a person."[16]

The evidence shows Lambert killed August Eisner in the driveway. There is no evidence that Lambert assaulted Eisner while in the residence or that the assault occurred "in so entering" or "in immediate flight" from the residence. Insufficient

---

[16] Jury instruction 27 states, in pertinent part:

To convict the defendant of the crime of burglary [of Susan Lambert and James Coffin] in the first degree as charged in Count VI, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1)     That on or about October 3, 2011, the defendant entered or remained unlawfully in a building — the residence of Susan Lambert and Jim Coffin at 1739 Hastie Lake Road;
(2)     That the entering or remaining was with intent to commit a crime against a person or property therein;
(3)     That in so entering or while in the building or in immediate flight from the building the defendant was armed with a deadly weapon or assaulted a person; and
(4)     That any of these acts occurred in the State of Washington.

25

evidence supports the assault prong of burglary in the first degree. Because there is no particularized expression of jury unanimity, the conviction for burglary in the first degree violated Lambert's right to a unanimous jury verdict. Woodlyn, 392 P.3d at 1066; Armstrong, No. 93119-4, slip op. at 10. We reverse the conviction of felony murder of August Eisner predicated on burglary in the first degree and burglary in the first degree of the residence of Susan Lambert and James Coffin. State v. Garcia, 179 Wn.2d 828, 843-44, 318 P.3d 266 (2014) (reversing conviction where sufficient evidence did not support each alternative means); see also State v. Hickman, 135 Wn.2d 97, 103, 954 P.2d 900 (1998). On remand, the State may retry Lambert on the charge of premeditated murder in the first degree and burglary in the first degree of the residence of Susan Lambert and James Coffin on the deadly weapon prong.

Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Felony Murder Jury Instruction

Lambert argues the to-convict felony murder jury instruction related to George Lambert omits an essential element of the crime of felony murder.[17] Lambert claims the jury instruction relieved the State of its burden to prove beyond a reasonable doubt that he committed or attempted to commit burglary in the first degree. We disagree.

We review the sufficiency of a to-convict instruction de novo. State v. Williams, 162 Wn.2d 177, 182, 170 P.3d 30 (2007). The to-convict instruction must contain all the elements of the charged crime. State v. Mills, 154 Wn.2d 1, 7, 109 P.3d 415 (2005). The State must prove Lambert committed or attempted to commit the predicate felony

---

[17] Because we reverse the conviction for felony murder of August Eisner on other grounds, we do not address the sufficiency of the to-convict instruction for that count.

of burglary in the first degree as an essential element of felony murder. RCW 9A.32.030(c). Jury instruction 16 states, in pertinent part:

> To convict the defendant of the crime of murder in the first degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> . . . .
>
> (b) That the defendant caused the death of George Lambert
> (i) During the course of, in furtherance of, or in immediately [sic] flight from the <u>commission of burglary in the first degree</u>, and
> (ii) George Lambert was not a participant in the crime of burglary in the first degree.[18]

The jury instruction required the State to prove "the commission of burglary." Contrary to Lambert's strained reading, the instruction makes clear the State must prove beyond a reasonable doubt that Lambert caused the death of George Lambert during the course of or in the furtherance of the commission of burglary in the first degree.

Double Jeopardy

Lambert argues the conviction of felony murder of George Lambert predicated on burglary in the first degree and the conviction of burglary in the first degree of the residence of George Lambert and Kay Gage violate the constitutional prohibition against double jeopardy. Interpretation and application of double jeopardy is a question of law that we review de novo. State v. Freeman, 153 Wn.2d 765, 770, 108 P.3d 753 (2005).

The double jeopardy clause of the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution protects a

---

[18] Emphasis added.

27

defendant against multiple punishments for the same offense.[19] But the State may charge a defendant with multiple crimes arising from the same criminal conduct. Freeman, 153 Wn.2d at 770. The fact the same conduct is used to prove each crime is not dispositive. Freeman, 153 Wn.2d at 777. The dispositive question in analyzing whether two convictions violate double jeopardy is whether the legislature authorized multiple punishments. State v. Calle, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). Subject to constitutional constraints, the legislature has the power to define crimes and assign punishment. Calle, 125 Wn.2d at 776. In determining whether the legislature intended to punish two separate offenses, we first look to the language of the statutes. Calle, 125 Wn.2d at 776.

The legislature authorizes cumulative punishment for crimes committed during the commission of a burglary. RCW 9A.52.050; Calle, 125 Wn.2d at 776; see also State v. Bonds, 98 Wn.2d 1, 15, 653 P.2d 1024 (1982) (" '[T]he anti-merger statute is an express statement that the legislature intended to punish separately any other crime committed during the course of a burglary.' ") (quoting State v. Hoyt, 29 Wn. App. 372, 377-78, 628 P.2d 575 (1981)). RCW 9A.52.050 states:

> Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately.

In State v. Elmore, 154 Wn. App. 885, 900, 228 P.3d 760 (2010), we held that under the burglary antimerger statute, convictions for both burglary and felony murder predicated on the burglary did not violate double jeopardy. "[T]he clear legislative intent behind the burglary antimerger statute" compels the conclusion that "the burglary

---

[19] The Fifth Amendment states, in pertinent part, "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Article I, section 9 of the Washington Constitution guarantees that "[n]o person shall . . . be twice put in jeopardy for the same offense."

antimerger statute allows for separate punishment when burglary is the predicate crime of the felony murder." Elmore, 154 Wn. App. at 900.

Lambert's reliance on Harris v. Oklahoma, 433 U.S. 682, 97 S. Ct. 2912, 53 L. Ed. 2d 1054 (1977), is misplaced. In Harris, the defendant was first convicted of felony murder after shooting a store clerk during a robbery and later, based on the same incident, convicted on the separate charge of robbery with a firearm. Harris, 433 U.S. at 682. The Court in Harris did not address application of an antimerger statute.

We conclude the convictions for burglary in the first degree and felony murder predicated on the burglary do not violate double jeopardy.

Right to Self-Representation

During Lambert's examination of Dr. Bishop during the defense case, the court ruled Lambert had "lost his right . . . to represent himself." The court appointed Lambert's standby counsel to represent him for the rest of the trial. Lambert asserts the court violated his constitutional right to self-representation by ruling that he forfeited the right to represent himself and ordering standby counsel to complete the trial. We review a trial court's decision to terminate self-representation for abuse of discretion. State v. Floyd, 178 Wn. App. 402, 408, 316 P.3d 1091 (2013); see State v. Madsen, 168 Wn.2d 496, 504, 229 P.3d 714 (2010). "A trial court abuses its discretion 'only when its decision is manifestly unreasonable or is based on untenable reasons or grounds.' " State v. Borboa, 157 Wn.2d 108, 121, 135 P.3d 469 (2006) (quoting State v. C.J., 148 Wn.2d 672, 686, 63 P.3d 765 (2003)).

"Criminal defendants have the federal and state constitutional right to self-representation." State v. Coley, 180 Wn.2d 543, 560, 326 P.3d 702 (2014); Madsen,

168 Wn.2d at 503; Faretta v. California, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). But the right to self-representation is not absolute. Madsen, 168 Wn.2d at 504. "[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." Faretta, 422 U.S. at 834 n.46; Floyd, 178 Wn. App. at 409. "After pro se status is granted, the court . . . may . . . terminate pro se status if a defendant is sufficiently disruptive or if delay becomes the chief motive." Madsen, 168 Wn.2d 509 n.4; Floyd, 178 Wn. App. at 409. But a court cannot deny a defendant the right to self-representation based on lack of familiarity with legal rules or "obnoxious" behavior. Madsen, 168 Wn.2d. at 509.

Relying on the Supreme Court decision in Madsen, Lambert claims the court improperly terminated his right to represent himself because of intransigence, his ability or lack thereof to follow the rules of evidence, disrespect for the court, and needless waste of time.[20] Neither Madsen nor the record supports his argument. Unlike in Madsen, the record shows Lambert repeatedly engaged in disruptive, contemptuous, and obstructionist behavior and the court repeatedly warned Lambert that he would lose his right to represent himself if he continued to engage in such behavior.

For example, during pretrial hearings, Lambert repeatedly engaged in belligerent and obstructive behavior. The court warned Lambert that if his belligerent behavior continued, it would remove him from the courtroom for obstructive behavior.[21] At the

---

[20] In Madsen, the defendant interrupted the court "on several occasions" during a pretrial hearing. Madsen, 168 Wn.2d at 501. The trial court deferred ruling on Madsen's motion to proceed pro se for over two months. Madsen, 168 Wn.2d at 501-02. On the day before trial was scheduled to begin, the court denied Madsen's motion as untimely. Madsen, 168 Wn.2d at 503. The Supreme Court concluded the trial court erred in ruling the motion was untimely. Madsen, 168 Wn.2d at 508.

[21] The court stated that "[t]o the extent that the Defendant continues to be belligerent in his written and spoken words, he is taking the risk that the Court may remove him from the courtroom for obstructive behavior."

conclusion of a pretrial hearing on October 19, 2012, Lambert verbally attacked and

shouted at the court.

> JOSHUA D. LAMBERT: Well, I'm not going to show up on the 27th, I can guarantee that. You're going to have to drag me down here.
> You can't force somebody to go to Court without fucking evidence.
> DEPUTY SHERIFF: Stand up.
> DEPUTY SHERIFF: Just stand up. Just stand up.
> JOSHUA D. LAMBERT: Fucking ridiculous. Where is my shoe?
> You got no real evidence. You fucking lied, you fucking shit, more than fucking anybody I've ever fucking seen. You've got more lies in that fucking shit than I've ever seen.
> Well, I'm not going to be here on the 27th. You're going to—
> You're going to have to reschedule that. Fucking lying piece of shit.
> DEPUTY SHERIFF: Come on over here.
> JOSHUA D. LAMBERT: Sorry ass-fucking people.

At the next hearing on October 30, the court admonished Lambert and warned

him that he would lose his right to represent himself if he continued to "act[ ] out."

> [THE COURT:] Before I begin, I want to speak with Mr. Lambert.
> Mr. Lambert, you acted out very badly at the last hearing using profane, foul language, screaming and yelling.
> I want to make sure that you're going to behave in a professional manner during this hearing. All right?
> Can you do that?
> JOSHUA D. LAMBERT: Yes.
> THE COURT: All right. You better. Because I'm getting very close to saying you can't represent yourself because of your behavior.

At the June 24, 2013 readiness hearing, Lambert yelled, accused the judge of

"lying," and repeatedly interrupted the judge. The judge warned Lambert that if his

behavior continued, he would lose the right to represent himself.

> THE COURT: I'm sorry. But that's not up to you to start interrupting me. And I will not allow it.
> And I've told you this before: If you keep it up, then you will not be representing yourself. I will not have this kind of behavior in this

31

courtroom.

At the conclusion of the hearing, the judge told Lambert that during trial, he could not argue "back and forth" and must act in a professional manner. The judge warned Lambert that the "ability to represent yourself is in your hands."

> THE COURT: All right. We're going to get a few things settled here. And that is your behavior at trial.
> There's not going to be any of this argument back and forth. You're going to act like a professional.
> You said you wanted to be your own attorney. An attorney has to act a certain way in Court.
> You don't act that way.
> If it occurs that you go into one of these rants of yours, I'm going to have you taken out. I will not put up with having the whole judicial system made a joke by you and your attitude and your behavior.
> So I am putting [standby counsel] on notice. You may have to jump in.
> So your ability to represent yourself is in your hands, Mr. Lambert, and no others [sic].

At the next hearing on June 28, Lambert accused the court of "twisting" the law and called certain witnesses liars. The court admonished Lambert that at trial, he could not "comment on whether somebody is dishonest or doesn't know the law."

During a pretrial hearing on July 5, Lambert yelled at the judge, called the judge a "fucking retard," and accused witnesses of "lying against" him. Later that day, the court again warned Lambert that if he continued "screaming and yelling" and being disruptive and disrespectful, he would lose his right to represent himself.

> Before we get started on the Defendant's Motions in Limine, I need to advise Mr. Lambert that your behavior this morning was unacceptable.
> That if you continue to act disruptive, disrespectful to the Court, screaming and yelling, and not following the procedures of the Court, then you will be removed from the Court.
> If you continue to do that, you will be denied your right to self-representation.
> The Court is on very solid ground — Whenever a defendant, such as yourself, has continually been disrespectful to the Court, has been

disruptive, and will not follow any procedures — in doing what I'm advising you will happen, if you continue.[22]

The two-week jury trial began on July 10, 2013. The State concluded its case in chief on July 15. The defense case began on July 17. On July 18, Lambert called consulting psychiatrist Dr. Wilson as a witness. Lambert was argumentative during the examination of Dr. Wilson. The court sustained several objections that Lambert was harassing the witness. Lambert then argued with the court. Outside the presence of the jury, the court warned Lambert that if his behavior continued, "I will not allow you to represent yourself. I will have your stand-by counsel step in." The court reiterated, "[T]he next time you do this will be the last time that you represent yourself in this courtroom. . . . I will not put up with this disruptive behavior of yours any longer."

Following the recess, Lambert called Island County Coroner Dr. Bishop. During the direct examination, Lambert asserted the coroner's testimony was different from what he said during a recorded interview. Lambert asked Dr. Bishop, "Are you trying to make the . . . wounds on [George]'s face look worse than they were by lying about your

---

[22] On July 8, the court entered findings of fact and conclusions of law on the need for courtroom security. The court made a number of findings as to Lambert's courtroom behavior. The unchallenged findings state, in pertinent part:

9. The Defendant's courtroom behavior, while not being physical, has come to the point at various times in hearings that the Court was concerned that there would be a physical outburst by the Defendant.

10. On motion hearings before the Court, when decisions or rulings are agains[t] the Defendant, the Defendant has been observed to get very upset. The Defendant has raised his voice and his demeanor and posture looks as if he is ready to jump at someone. The Court has noticed that the Defendant has often looked like he was ready to jump at the Trial Judge as well as the Prosecutor.

11. On quite a few occasions, there have been times that the Defendant has had verbal outbursts calling everyone "idiots" or something similar. The Defendant has accused the prosecutor and the Court of lying and conspiring to deny him his rights.

12. The Defendant has been in physical restraints at all pretrial appearances before the court. The Defendant has not physically acted out in the courtroom, but the Judge has constantly given warnings to the Defendant throughout the pretrial proceedings that if [he] does not restrain his behavior, that the Judge might not allow him to continue to represent himself.

33

statement"? The court sustained the State's objection and warned Lambert, "Do not continue this line of questioning."

On redirect examination, Lambert challenged the truthfulness of Dr. Bishop. Lambert asked Dr. Bishop:

> Q      Hmm. Is there any reason you can't remember anything that's supportive of my case.
>
> [PROSECUTOR]: Objection. Argumentative.
> THE COURT: Sustained.
>
> Q      (By Joshua D. Lambert) Hmm. Are you aware of what perjury is?
>
> [PROSECUTOR]: Objection. Argumentative.
> THE COURT: All right [sic]. This is sustained.

The court excused the jury. The court ruled Lambert "lost his right, by his behavior, to represent himself." The court appointed standby counsel to represent Lambert for the rest of the trial. The court stated Lambert was "argumentative," "disrespectful to the Court," and "tried to call everybody a liar."

The record shows Lambert repeatedly engaged in disruptive, contemptuous, and obstructionist behavior before and during trial and the court repeatedly warned Lambert that if his behavior continued, he would lose his right represent himself. We conclude the court did not abuse its discretion in ruling Lambert forfeited the right to represent himself. Floyd, 178 Wn. App. at 410 (trial court did not abuse its discretion in terminating self-representation where record showed "repeated disruptions by [the defendant] and repeated admonitions by the court").

Lambert also argues the prosecutor impermissibly commented on his right to represent himself during cross-examination and during closing argument. Lambert argues the prosecutor violated his constitutional right to self-representation by asking him about research he did on the symptoms of psychiatric disorders and by arguing in

34

closing that Lambert's research allowed him to tailor evidence about his symptoms. The record does not support his argument.

The State may not draw adverse inferences from a defendant's exercise of a constitutional right. State v. Rupe, 101 Wn.2d 664, 705, 683 P.2d 571 (1984); State v. Moreno, 132 Wn. App. 663, 672-73, 132 P.3d 1137 (2006). But "not all arguments touching upon a defendant's constitutional rights are impermissible comments on the exercise of those rights." State v. Gregory, 158 Wn.2d 759, 806, 147 P.3d 1201 (2006). We look to see if the prosecutor manifestly intended the remarks to be a comment on a defendant's constitutional rights. Gregory, 158 Wn.2d at 806-07. Where the prosecutor's question or argument does not focus on the right to self-representation itself, the question or argument does not violate the constitutional right at issue. Gregory, 158 Wn.2d at 807.

Here, the prosecutor's questions and argument did not comment directly on Lambert's constitutional right to self-representation. The prosecutor's questions and argument were limited to whether Lambert's research of psychiatric disorders allowed him to report symptoms in an attempt to obtain a particular psychiatric diagnosis. The prosecutor did not violate Lambert's right to represent himself.

During the State's cross-examination of Lambert, the prosecutor asked Lambert if he was familiar "with the criteria for diagnosing schizophrenia from reading the DSM"[23] and whether he "obtain[ed] Internet research regarding symptoms of psychiatric disorders." In closing, the prosecutor argued Lambert's research allowed him to

---

[23] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV-TR (4th rev. ed. 2000).

"fashion symptoms that he thinks meet these mental disorders."

> Well, Mr. Lambert knows enough to be dangerous. I'm not talking about the dangerousness physically, but it's an expression that he knows a little, and he has access to materials, and he can read the DSM, and he can do Internet research and find articles, and he can fashion symptoms that he thinks meet these mental disorders, these medical problems.

The record shows the prosecutor did not impermissibly comment on Lambert's constitutional right to represent himself.

## Motion for Acquittal by Reason of Insanity

Lambert contends the decision to defer ruling on his motion for acquittal on the grounds of insanity until after the presentation of the evidence at trial violates RCW 10.77.080.[24]

We review questions of statutory interpretation de novo. State v. Conover, 183 Wn.2d 706, 711, 355 P.3d 1093 (2015). When interpreting a statute, our fundamental objective is to determine and give effect to the intent of the legislature. State v. Sweany, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). We look first to the plain language of the statute. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). "If the plain language of the statute is unambiguous, then this court's inquiry is at an end." Armendariz, 160 Wn.2d at 110. We "must not add words where the legislature has chosen not to do so." State v. Christensen, 153 Wn.2d 186, 194, 102 P.3d 789 (2004).

RCW 10.77.080 states:

> The defendant may move the court for a judgment of acquittal on the grounds of insanity: PROVIDED, That a defendant so acquitted may not

---

[24] The "Order on State's Motion To Defer Hearing and Ruling on Defendant's Motion for Acquittal Based on Insanity Until After All Evidence is Presented at Trial" states, in pertinent part:

> [T]he court will defer hearing and ruling on the defendant's Motion for Acquittal on Grounds of Insanity until after all the evidence is presented during the upcoming trial scheduled to begin on July 9, 2013, and before the issue of insanity is submitted to the jury for deliberation.

later contest the validity of his or her detention on the grounds that he or she did not commit the acts charged. At the hearing upon the motion the defendant shall have the burden of proving by a preponderance of the evidence that he or she was insane at the time of the offense or offenses with which he or she is charged. If the court finds that the defendant should be acquitted by reason of insanity, it shall enter specific findings in substantially the same form as set forth in RCW 10.77.040. If the motion is denied, the question may be submitted to the trier of fact in the same manner as other issues of fact.

The plain and unambiguous language of the statute does not require the court to hear or rule on a motion for acquittal on the grounds of insanity before presentation of evidence at trial. Further, a trial court has broad discretionary authority to manage proceedings in order to achieve the orderly and expeditious disposition of cases. RCW 2.28.010, .150; Gregory, 158 Wn.2d at 816.[25]

Lambert cites Faretta; State v. Rafay, 167 Wn.2d 644, 222 P.3d 86 (2009); and State v. Jones, 99 Wn.2d 735, 664 P.2d 1216 (1983), to argue the court's decision to defer ruling on the motion violated his right to control his defense. Faretta, Rafay, and Jones, are inapposite. Faretta addressed the right to self-representation at trial. Faretta, 422 U.S. at 807. Rafay addresses the right to self-representation on appeal. Rafay, 167 Wn.2d at 648. Jones addressed whether a court may enter a plea of not guilty by reason of insanity over a defendant's objection. Jones, 99 Wn.2d 737. The court did not err in deferring the hearing and ruling on Lambert's motion for acquittal on the grounds of insanity until after the presentation of the evidence at trial.[26]

---

[25] Lambert claims the court violated the appearance of fairness doctrine by deferring hearing and ruling on the motion to acquit. Lambert has the burden of presenting evidence of actual or potential bias. State v. Gamble, 168 Wn.2d 161, 187-88, 225 P.3d 973 (2010); State v. Dominguez, 81 Wn. App. 325, 328-29, 914 P.2d 141 (1996). Lambert points to no evidence showing actual or potential bias on the part of the trial judge.

[26] For the first time on appeal, Lambert claims the court did not correctly apply the standard of preponderance of the evidence in denying his motion for acquittal on grounds of insanity. We decline to consider this argument for the first time on appeal. RAP 2.5(a); State v. Gentry, 183 Wn.2d 749, 760, 356 P.3d 714 (2015).

Statement of Additional Grounds

In his pro se statement of additional grounds, Lambert claims insufficient evidence supports the jury finding that he was sane at the time he committed the crimes. Insanity is an affirmative defense. State v. Beaver, 184 Wn.2d 321, 329, 358 P.3d 385 (2015). Lambert bears the burden of proving insanity by a preponderance of the evidence. RCW 10.77.080; State v. Box, 109 Wn.2d 320, 328, 745 P.2d 23 (1987). When reviewing a jury's rejection of a defendant's insanity defense, we determine whether, after " 'considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove the defense by a preponderance of the evidence.' " State v. Matthews, 132 Wn. App. 936, 941, 135 P.3d 495 (2006) (quoting State v. Lively, 130 Wn.2d 1, 17, 921 P.2d 1035 (1996)). Viewing the testimony of Dr. Dean and Dr. Judd in the light most favorable to the State, a rational trier of fact could find Lambert failed to prove by a preponderance of the evidence that he was insane.[27]

We reverse and dismiss with prejudice the conviction for felony murder of August Eisner predicated on burglary in the first degree and the conviction of burglary in the first degree of the residence of Susan Lambert and James Coffin. On remand, the

---

[27] Lambert also asserts the court violated his right to self-representation by ruling that he forfeited the right to represent himself. This argument is addressed by appellate counsel. See RAP 10.10(a); State v. Thompson, 169 Wn. App. 436, 493, 290 P.3d 996 (2012) (alleged error thoroughly addressed by counsel not proper matter for statement of additional grounds).

State may retry Lambert on premeditated murder of August Eisner and burglary in the first degree while armed with a deadly weapon. In all other respects, we affirm.

WE CONCUR:

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 MAY 22 AM 11: 31