# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56961-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ROBERT ERIC NELSON, | |
| Appellant. | |

MAXA, J. – Robert Eric Nelson appeals from his convictions of first degree burglary and attempted first degree rape. The convictions arose out of an incident in which the victim invited Nelson to stay at his workshop/apartment, and after they drank a few alcoholic beverages and consumed a drug purported to be cocaine Nelson attacked the victim. The victim was able to fend off the attack after struggling with Nelson for approximately 10 minutes.

We hold that (1) the evidence was sufficient to sustain the first degree burglary conviction because the victim impliedly revoked any permission that Nelson had to be on the premises during the 10-minute struggle with Nelson; (2) the trial court did not err when it denied Nelson's request for a voluntary intoxication instruction because Nelson did not present any evidence regarding the effects of his drug use on his ability to form intent; (3) the trial court erred when it determined that the first degree burglary and attempted first degree rape offenses were not same criminal conduct because his intent for each offense was the same, but we remand for the trial court to determine whether to punish the offenses separately under the burglary

antimerger statute, RCW 9A.52.050; (4) under a recent statutory amendment, Nelson is entitled

to have the imposition of community custody supervision fees stricken from the judgment and

sentence; and (5) Nelson's arguments in his statement of additional grounds (SAG) either fail or

we cannot address them.

Accordingly, we affirm Nelson's convictions but reverse the trial court's same criminal

conduct determination. We remand for the trial court to determine whether to apply the burglary

antimerger statute and to strike the community custody supervision fees.

FACTS

*Background*[1]

On the evening of September 5, 2021, Nelson called his friend EM and asked if he could

stay the night at EM's place because he had been fighting with his girlfriend. EM agreed to let

Nelson come over and to stay the night in an apartment attached to his garage workshop.

The two men visited with each other in the garage, and each man drank some beer. After

about two hours, Nelson told EM that he was tired and wanted to go to sleep. EM set up a chair

in the apartment's living room for Nelson to sleep in. After settling Nelson in the chair, EM

returned to the garage to continue working.

EM later entered the apartment to use the restroom. EM noticed that Nelson was no

longer in the chair. When EM turned his head the other way, Nelson punched him in the right

eye and almost knocked him out. Despite being dazed by the punch, EM reacted by fighting

back.

---

[1] Because the background facts are relevant to Nelson's sufficiency of the evidence argument, they are taken in the light most favorable to the State. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019).

During the ensuing struggle, the two men ended up on the ground with Nelson on top of EM. Nelson continued to hit EM in the face while grabbing EM's crotch, attempting to kiss EM, and attempting to pull down EM's pants. During the struggle, Nelson told EM that he did not understand why EM was fighting him because EM had been giving him hints that he wanted a sexual encounter.

After struggling with Nelson for approximately 10 minutes, EM started to gain the advantage. When EM asked Nelson if he was trying to rape him, Nelson got up, told EM not to follow him because he had a gun, and headed out to his car. EM or his wife then called 911. Deputy Andrew Yocum responded to the 911 call and later obtained a recorded statement from Nelson about the incident.

The State charged Nelson with first degree burglary and attempted first degree rape.

*Trial Testimony*

At trial, EM testified to the facts set out above. Yocum testified about his investigation, including his recorded interview with Nelson. In the recorded interview, Nelson told Yocum that he did not remember anything between the time he took the drugs and when he left EM's apartment. Yocum also testified that while at EM's apartment, he observed blood on the floor and took photographs of the area.

Nelson's girlfriend testified for the defense. She testified that when Nelson returned home at about 3:00 AM on September 6, he appeared "kind of incoherent" because his eyes were glazed and he had a "blank look on his face." Rep. of Proc. (RP) at 204, 206.

Nelson testified that he drank two 12 ounce light beers and half of a small mixed drink while he and EM were visiting in EM's garage. EM then offered him a white substance that EM said was cocaine. Nelson stated that almost immediately after he snorted about a half-inch of

3

this substance, he started to feel strange, as if things were happening in slow motion. Because he felt odd, he told EM that something was wrong. He then lay down on the apartment's living room floor and fell asleep.

Nelson described feeling as if he had been shot with a tranquilizer dart, noting that he was having a hard time moving his arms and legs and that he was unable to get up for some time. He stated that his heart was racing and that he felt faint and afraid for his health. He further stated that he "was in and out a little bit" while he was on the floor and that he was unsure of how long he lay there. RP at 225. But he testified that he was aware that EM went in and out of the room during that time.

Nelson denied attacking EM, holding EM down, attempting to kiss him, grabbing his crotch, or trying to pull his pants down. He asserted that due to his physical limitations, it would have been impossible for him to hold anyone down for more than 30 seconds. Instead, Nelson testified that at some point before midnight, EM told him that he had to get off of the floor and go sleep in the car. The two exchanged words, and EM became agitated, grabbed him by his vest, and started shoving him backwards. Nelson stated that he responded by hitting EM in the eye and then leaving.

Nelson testified that he felt ill for about four days after taking the drugs at EM's. During that time, he would "find [him]self kind of spacing out for like 15, 20 minutes." RP at 244.

Nelson denied telling Yocum that he did not remember anything that happened after he ingested the cocaine or that he did not remember anything until he arrived at home. He agreed that he barely remembered driving home. But Nelson asserted that the only part of the evening that he did not remember was when he was laying on the floor drifting in and out of consciousness.

4

Nelson also acknowledged that he texted EM the next day and said that he owed him an apology and that he had "no memory for several hours." RP at 248. But when the State asked whether the claim that he had no memory was correct or whether he remembered EM pushing and grabbing him, Nelson testified, "I was on the floor . . . until he woke me up. When -- when I stood up, he grabbed me and was pushing me, and I punched him in the eye. That's exactly what happened." RP at 249. Similarly, Nelson later testified that although he did not remember anything while he was laying on the floor and that on his drive home time seem distorted, he did remember EM waking him up and telling him to go out and sleep in the car.

The State recalled Yocum on rebuttal. Yocum testified that he had asked Nelson if he remembered anything between the time he took the drugs and when he left EM's apartment, and Nelson responded, "No." RP at 278. But Yocum further testified that Nelson had also stated that he remembered EM yelling at him, shoving him, and telling him that he had to go, but he did not remember much about driving home.

Nelson requested a voluntary intoxication instruction. The trial court declined Nelson's request because Nelson had not presented evidence that the drinking or drugs impaired his ability to form intent or that he lacked awareness of his actions at the time of the incident.

*Verdict and Sentencing*

The jury convicted Nelson of first degree burglary and attempted first degree rape.

At the sentencing hearing, Nelson argued that the two offenses were the same criminal conduct because both offenses required an intent to assault EM. The State responded that the trial court should not find that the two offenses constituted the same criminal conduct because they did not share the same intent. The State argued that the attempted first degree rape was based on intent to have sexual intercourse and that the burglary was based on an intent to commit

an assault. The State also noted that the trial court could find that the two offenses were separate

offenses under the burglary antimerger statute.

The trial court concluded that the two offenses were not the same criminal conduct,

ruling that the two offenses had different criminal intents. In its oral ruling, the court stated,

> Well, first I will tell the parties in looking at the statute, and I was able to do a quick search on Westlaw comparing burglary in the first degree and *rape in the first degree*, and my instinct was is that they were completely different criminal intents therefore making them -- making them not the same or similar criminal conduct. I was able to do a quick Westlaw search to verify that. And so I am going to make the finding that they are in fact completely separate criminal intent, and therefore under the statute would not be same or similar criminal conduct.

RP (May 2, 2022) at 33 (emphasis added). The trial court did not address the burglary

antimerger statute.

Although the trial court found that Nelson did not have the ability to pay legal financial

obligations, the trial court imposed community custody supervision fees in the judgment and

sentence.

Nelson appeals his convictions, his sentence, and the imposition of the community

custody supervision fees.

ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE – BURGLARY

Nelson argues that we must reverse his first degree burglary charge because the State

failed to present sufficient evidence that he remained unlawfully on the premises. He asserts that

the evidence that he may have formed a criminal intent at some point during his visit does not

establish that he unlawfully remained on the premises because EM did not expressly or impliedly

limit the invitation.

6

The State responds that it presented sufficient evidence from which the jury could have concluded that Nelson remained unlawfully on the premises because EM impliedly revoked any permission to be on the premises when he fought back after Nelson's initial attack. We agree with the State.

1.    Legal Principles

The test for determining the sufficiency of evidence is whether any rational trier of fact could find the elements of the charged crime beyond a reasonable doubt after viewing the evidence in a light most favorable to the State. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). We resolve all reasonable inferences based on the evidence in favor of the State and interpret inferences most strongly against the defendant. *Id*.

The jury was instructed that to find Nelson guilty of first degree burglary it had to find that, with intent to commit a crime, he entered or remained unlawfully in a building and assaulted EM. *See* RCW 9A.52.020(1). "A person 'enters or remains unlawfully' in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(2).

Here, it is undisputed that Nelson entered EM's apartment lawfully – EM invited him to enter. The question is whether Nelson remained unlawfully in the apartment once he began attempting to rape EM.

In *State v. Collins*, the Supreme Court held that when the defendant's initial entry onto premises was lawful, the defendant's presence may become unlawful "because of an implied limitation on, or revocation of, his privilege to be on the premises." 110 Wn.2d 253, 258, 751 P.2d 837 (1988). The court stated, "[I]n some cases, depending on the actual facts of the case, a limitation on or revocation of the privilege to be on the premises may be inferred from the

circumstances of the case." *Id.* at 261. More recently, the Supreme Court explained that "[i]n *Collins*, we held that an implied limitation on or revocation of a license may exist depending on the circumstances." *State v. Moreno*, 198 Wn.2d 737, 754, 499 P.3d 198 (2021).

Whether an invitation onto premises has been limited or revoked is determined on a case by case basis. *Collins*, 110 Wn.2d at 258. And the court in *Collins* emphasized that allowing for an inference that an invitation has been limited or revoked "neither renders part of the [burglary] statute superfluous nor converts all indoor crimes into burglaries" because not all cases will support such an inference. *Id.* at 261-62.

In *Collins*, two women allowed the defendant into their house to use the telephone because he appeared to be lost. *Id.* at 254-55. After using the phone, the defendant grabbed the two women and dragged them into a bedroom as the women struggled. *Id.* at 255. The court found that the defendant remained unlawfully in the house based on two theories. First, the record supported an inference that the invitation given the defendant to enter the house was limited to a specific area and a specific purpose – to go where the telephone was located and to use the telephone. *Id.* at 261. The court stated,

> Collins remained unlawfully on the premises, because he exceeded the scope of his invitation. Collins was invited to use the telephone. Once that purpose was accomplished, his license expired, and by remaining in the house and committing crimes, he committed first degree burglary.

*Id.* at 255.

Second, the court stated, "Once Collins grabbed the two women and they resisted being dragged into the bedroom, any privilege Collins had up to that time was revoked." *Id.* at 261. The court adopted the reasoning of a Georgia case, *Hambrick v. State*, 174 Ga. App. 444, 330 S.E.2d 383 (1985). *Collins*, 110 Wn.2d at 261. The court in *Collins* quoted a passage from *Hambrick* in which the Georgia court held that once a guest who the victim authorized to be in

8

the victim's residence began " 'offensive, aggressive behavior' " and the victim resisted, " 'a reasonable inference could be drawn that the authority to remain ended.' " *Id.* (quoting *Hambrick*, 174 Ga. App. at 447). And the victim " 'did not have to shout "Get out!" for this to be so.' " *Collins*, 110 Wn.2d at 261 (quoting *Hambrick*, 174 Ga. App. at 447).

> 2. Analysis

Here, Nelson lawfully entered EM's apartment because EM invited him to stay there. But viewing the evidence in the light most favorable to the State, Nelson then attacked and attempted to rape EM, who vigorously resisted and struggled with Nelson for approximately 10 minutes. These facts are similar to the facts in *Collins*, where the court found that the defendant's privilege to be in the victims' house was revoked once the defendant grabbed the victims and they resisted. 110 Wn.2d at 261. And the facts are similar to *Hambrick*, where the court held that there was a reasonable inference that the defendant's authority to be on the victim's premises ended when the defendant began offensive and aggressive behavior and the victim reacted against it. 174 Ga. App. at 447.

The facts here also are similar to the facts in *State v. Lambert*, 199 Wn. App. 51, 395 P.3d 1080 (2017). In that case, the defendant visited his grandfather's house as he often did but then held a knife to his grandfather's throat in an effort to obtain a gun. *Id.* at 56-57. The grandfather fought and struggled with the defendant for a long time until the defendant stabbed him to death. *Id.* at 57, 74. The court held that a jury could reasonably infer that any invitation to enter and remain in the house was revoked when the defendant attacked his grandfather and his grandfather resisted. *Id.* at 73.

9

Nelson attempts to distinguish *Collins* because the defendant in that case exceeded the scope of his invitation, while he did not. Nelson also relies on *State v. Davis*, where the court stated in a footnote that "[t]he implied revocation of license should apply only in cases where the license to enter was limited to a specific purpose." 90 Wn. App. 776, 781 n.6, 954 P.2d 325 (1998). But Nelson ignores that exceeding an implied limitation on an invitation onto the premises was only one of the grounds on which the court in *Collins* relied. The court in *Davis* also focused only on this ground. But as noted above, the court expressly relied on a second ground, holding that revocation of an invitation can be implied when the defendant attacked the persons initially giving permission to enter and those persons resisted. *Collins*, 110 Wn.2d at 261.

Nelson also relies on *State v. Miller*, 90 Wn. App. 720, 954 P.2d 925 (1998), arguing that *Miller* demonstrates that merely intending to commit a crime while entering or remaining indoors does not constitute burglary. But *Miller* is inapposite here because that case did not address an implied revocation of permission. 90 Wn. App. at 726-27.

We conclude that viewing the facts in the light most favorable to the State, Nelson's attack and EM's resistance to that attack impliedly revoked any privilege that EM had given to Nelson to be on the premises. And because Nelson continued to attempt to sexually assault EM despite EM's resistance, a rational trier of fact could find beyond a reasonable doubt that Nelson remained unlawfully.

We are mindful of the court's admonition in *Collins* that not all indoor crimes constitute burglaries. 110 Wn.2d at 262. A brief scuffle may not amount to a revocation of an invitation. The key fact here is that EM testified that he and Nelson struggled for approximately 10 minutes.

A reasonable jury could infer that Nelson's permission to be on the premises was revoked at some point during that long struggle.

We hold that the evidence was sufficient to establish that Nelson remained unlawfully on the premises, and therefore we affirm Nelson's first degree burglary conviction.

B.     VOLUNTARY INTOXICATION INSTRUCTION

Nelson argues that the trial court erred when it declined his request to give a voluntary intoxication instruction.[2]  We disagree.

1.     Legal Principles

In general, jury "instructions are permitted upon a prima facie showing of some evidence in support of the [instruction]."  *State v. Arbogast*, 199 Wn.2d 356, 368, 506 P.3d 1238 (2022). The court in *Arbogast* clarified that "some evidence," not "substantial evidence," is the proper burden of production when a party is requesting a jury instruction.  *Id.* at 369-70.  When considering whether a proposed jury instruction is supported by the evidence, the trial court must draw all reasonable inferences from the evidence in the light most favorable to the requesting party.  *State v. Butler*, 200 Wn.2d 695, 715, 521 P.3d 931 (2022).  And the court must consider all the evidence, not just the defendant's testimony.  *State v. Fernandez–Medina*, 141 Wn.2d 448, 456, 6 P.3d 1150 (2000).

"A 'voluntary intoxication' instruction allows the jury to consider evidence of intoxication when deciding whether the State proved that the defendant acted with the requisite intent."  *State v. Webb*, 162 Wn. App. 195, 208, 252 P.3d 424 (2011).  To justify a voluntary

---

[2] The State argues that because Nelson asserted that the drug he took was not what he believed it to be, he actually was asserting at trial that he was involuntarily intoxicated and a voluntary intoxication instruction was not appropriate.  But Nelson did not request an involuntary intoxication instruction, so we limit our analysis to whether the trial court erred when it declined to give the voluntary intoxication instruction he requested.

intoxication instruction, the defendant must establish three things: "(1) the charged offense has a particular mens rea, (2) there is [some evidence] that the defendant was drinking and/or using drugs, and (3) there is evidence that the drinking or drug use affected the defendant's ability to acquire the required mental state." *Id*. at 209; *Arbogast*, 199 Wn.2d at 369-70 (clarifying that the burden of production when requesting a jury instruction is "some evidence" not "substantial evidence," the term used in *Webb*).

Regarding the third requirement, "[t]he evidence must reasonably and logically connect a defendant's intoxication with his inability to form the requisite mental state." *State v. Classen*, 4 Wn. App. 2d 520, 536, 422 P.3d 489 (2018). Significantly a person can be intoxicated and still may be able to form the requisite mental state to commit certain crimes even though they are intoxicated. *Id.* at 537-38.

In general, expert testimony is not necessary to support an intoxication defense based on alcohol intoxication because the effects of alcohol on a person are commonly known. *Id.* But the same is not true for drug intoxication. *Id*. When a defendant is asserting drug intoxication, they must present competent evidence that the drug at issue affected their ability to form the requisite mental state before the voluntary intoxication instruction is required. *Id*.

We review for abuse of discretion a trial court's refusal to provide a party's proposed jury instruction based on the facts of the case. *Arbogast*, 199 Wn.2d at 365. But it is reversible error to refuse to give a proposed jury instruction if the instruction properly states the law, the evidence supports giving the instruction, and the absence of the instruction prevents the defendant from arguing his theory of the case. *State v. Teas*, 10 Wn. App. 2d 111, 129, 447 P.3d 606 (2019).

2.      Ability to Acquire the Required Mental State

The parties do not dispute that the charged offenses required a particular mens rea or that there was evidence that Nelson was drinking alcohol and had ingested some kind of drug. Therefore, the only condition at issue is whether Nelson presented sufficient evidence that his drinking and drug use affected his ability to acquire the required mens rea.

Here, the required mens rea is the intent to commit a crime. A person is guilty of first degree burglary if, "with *intent to commit a crime* against a person or property, he or she enters or remains unlawfully in a building" and assaults another person. RCW 9A.52.020(1) (emphasis added). "A person is guilty of an attempt to commit a crime if, with *intent to commit a specific crime* against a person or property therein, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1) (emphasis added).

Nelson presented evidence that after drinking and ingesting the cocaine or cocaine-like substance, he felt strange and odd and needed to lay down. He felt as if he had been shot with a tranquilizer dart, he had trouble moving his arms and legs, and his heart was racing. Nelson further stated that he had little memory of when he was on the floor drifting in and out of consciousness. And he testified that he barely remembered driving home. The evidence also showed that when he arrived home, Nelson appeared to his girlfriend to be "kind of incoherent" and "out of sorts." RP at 205, 206.

There was mixed evidence regarding what Nelson remembered about the altercation with EM. In his recorded statement, Nelson told Yocum that he did not remember anything between the time he took the drugs and when he left EM's apartment. And in his text to EM the next day, Nelson stated that he had "no memory for several hours." RP at 248. But Nelson also said in his statement that he remembered EM yelling at him, shoving him, and telling him that he had to go.

13

And Nelson testified at trial that he remembered the altercation with EM, and gave his version of the events.

Viewed in the light most favorable to Nelson, the evidence indicated that Nelson felt strange after ingesting the drug and then had no memory of the incident. If Nelson's proposed voluntary intoxication instruction was based only on the ingestion of alcohol, this may have been sufficient to provide some evidence that he was unable to acquire the intent to commit the offenses. *See State v. Schierman*, 192 Wn.2d 577, 657-59, 438 P.3d 1063 (2018). But Nelson is not asserting that his ability to form intent was due to his alcohol ingestion – it is undisputed that he only had a few beers and part of a mixed drink. He is asserting that his ability to form intent was impaired by the drugs he took.

In *Classen*, the defendant presented evidence of unusual behavior and the defendant asserted he had no memory of the events that led to his charges. 4 Wn. App. 2d at 528-29, 537. On appeal, he argued that his defense counsel provided ineffective assistance of counsel by failing to request a voluntary intoxication instruction. *Id.* at 534-35. This court rejected this argument, holding that the defendant would not have been entitled to a voluntary intoxication defense because the effects of drug intoxication are not within the jury's common knowledge and he failed to present any evidence to establish that the drugs he took affected his ability to form the mens rea necessary to commit the charged crimes. *Id.* at 537-38.

As in *Classen*, the record here does not contain any competent evidence demonstrating that the drugs Nelson ingested affected his ability to form intent at the time of the offenses. And under *Classen*, Nelson's mere assertion of lack of memory is not sufficient to establish that at the time of the offense Nelson could not form intent due to his ingestion of the drugs.

Accordingly, even viewing the facts in the light most favorable to Nelson, the evidence does not establish that the drug use affected his ability to acquire the required intent at the time of the offenses. Accordingly, the trial court did not err when it refused to instruct the jury on voluntary intoxication.

C. SAME CRIMINAL CONDUCT

Nelson argues that the trial court erred when it concluded that the first degree burglary offense and the attempted first degree rape offense did not constitute the same criminal conduct. We agree, but we remand for the trial court to consider application of the burglary antimerger statute.

1. Legal Principles

Multiple current offenses that encompass the same criminal conduct are counted as one offense for purposes of calculating a defendant's offender score. RCW 9.94A.525(5)(a).[3] Under RCW 9.94A.589(1)(a), two or more offenses constitute the same criminal conduct when they "require the same criminal intent, are committed at the same time and place, and involve the same victim." Unless all three elements are present, the offenses are not the same criminal conduct. *State v. Canter*, 17 Wn. App. 2d 728, 741, 487 P.3d 916, *rev. denied*, 198 Wn.2d 1019 (2021). The defendant has the burden of showing that the offenses constitute the same criminal conduct. *Id*. And we generally apply the definition of same criminal conduct narrowly to "reject most assertions of same criminal conduct." *Id*.

We review the trial court's same criminal conduct determination for an abuse of discretion or misapplication of law. *Id*. Under this standard, a trial court abuses its discretion if

---

[3] RCW 9.94A.525 has been amended since the events of this case transpired. Because these amendments do not impact the statutory language we rely on, we refer to the current statute.

the record supports only one conclusion regarding same criminal conduct and the court makes a contrary ruling. *Id.* at 742. But where "the record adequately supports either conclusion, the matter lies in the court's discretion." *Id.*

The legislature has enacted a burglary antimerger statute: "Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately." RCW 9A.52.050.

2.    Same Criminal Conduct Analysis

The State concedes that only the intent prong of the same criminal conduct test is at issue. Regarding the criminal intent prong, the relevant inquiry whether the defendant's criminal intent, viewed objectively, "changed from one crime to the next." *State v. Tili*, 139 Wn.2d 107, 123, 985 P.2d 365 (1999).

As noted above, a person is guilty of first degree burglary if, "with *intent to commit a crime*, . . . he or she enters or remains unlawfully in a building" and assaults another person. RCW 9A.52.020(1) (emphasis added). "A person is guilty of an attempt to commit a crime if, with *intent to commit a specific crime*, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1) (emphasis added). And a person is guilty of first degree rape "when such person engages in sexual intercourse with another person by forcible compulsion" and the person inflicts serious personal injury. RCW 9A.44.040(1)(c).

Here, Nelson's objective intent did not change. He remained unlawfully with intent to commit a crime, specifically first degree rape. And he attempted to commit the specific crime of first degree rape by taking a substantial step toward engaging in sexual intercourse by forcible compulsion. His intent remained the same throughout – to commit first degree rape.

16

Accordingly, the trial court erred when it concluded that the two offenses constituted separate criminal conduct.[4]

     3.    Burglary Antimerger Statute

Even if two offenses constitute the same criminal conduct, under the burglary antimerger statute, RCW 9A.52.050, they still may be punished separately. *State v. Knight*, 176 Wn. App. 936, 962, 309 P.3d 776 (2013). The trial court has discretion whether to apply the burglary antimerger statute. *Id.*

Here, because the trial court determined that the two offenses were not the same criminal conduct, it did not address the burglary antimerger statute. Accordingly, we reverse the trial court's same criminal conduct determination and remand for the trial court to consider in its discretion whether to apply the burglary antimerger statute. If the trial chooses to apply the burglary antimerger statute, then Nelson's offender scores and sentences will remain the same. If the trial court chooses not to apply the burglary antimerger statute, then Nelson is entitled to a resentencing under the corrected offender score.

---

[4] In *State v. Westwood*, the Supreme Court recently held under the facts of that case that attempted first degree rape, first degree assault, and first degree burglary did not constitute the same criminal conduct. 100570-9, slip op. at 14-15 (Wash. Sept. 7, 2023), http://www.courts.wa.gov/opinions/pdf/1005709.pdf. But the facts here are different. In *Westwood*, the defendant entered the victim's residence at 4:30 AM with a knife and proceeded to assault and attempt to rape her. *Id.*, slip op. at 2. Viewing the facts objectively, there was no way of determining whether the defendant entered with the intent to commit rape or some other offense. In our case, Nelson entered lawfully, and there was no burglary until Nelson tried to rape EM. So the two offenses necessarily required the same intent.

D.      COMMUNITY CUSTODY SUPERVISION FEES

Nelson argues, and the State concedes, that the community custody supervision fees imposed in the judgment and sentence must be stricken. We accept the State's concession.

At the time of Nelson's offenses and sentencing hearing, former RCW 9.94A.703(2)(d) (2018) authorized supervision fees as a waivable condition of community custody. But effective July 2022, RCW 9.94A.703(2), no longer authorizes the imposition of community custody supervision fees. LAWS OF 2022, ch. 29, § 8.

Although this amendment did not take effect until after Nelson's May 2022 sentencing, it applies here because Nelson's case was still pending on appeal when the amendment took effect. *State v. Ellis*, ___ Wn. App. 2d ___, 530 P.3d 1048, 1057 [¶50] (2023). Accordingly, we remand for the trial court to strike the community custody supervision fees.

E.      SAG CLAIMS

In his SAG, Nelson asserts that defense counsel provided ineffective assistance of counsel on several grounds. We reject these claims because they rely on matters outside the record, do not identify the issue with sufficient detail, are not prejudicial, or are not supported by the record.

1.      Legal Principles

To prevail on an ineffective assistance of counsel claim, Nelson must show both that (1) defense counsel's representation was deficient and (2) the deficient representation was prejudicial. *State v. Vazquez*, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021). Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id*. Prejudice exists if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have differed. *Id*. at 248.

2. Claims Based on Matters Outside the Record

Several of Nelson's SAG claims rely on matters that are not in the appellate record. But we cannot address claims based on alleged evidence that is outside the record. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008); RAP 10.10(c).

First, Nelson asserts that defense counsel's failure to obtain a medical expert to examine the evidence and to testify about Nelson's medical conditions constituted deficient performance. But the appellate record does not contain any information related to whether defense counsel contacted any medical experts regarding Nelson's medical conditions. Nor does it contain any information regarding what additional information a defense medical expert could have provided.

Second, Nelson asserts that defense counsel failed to adequately advise him before trial, did not spend adequate time with him before trial, and was not experienced enough to provide adequate representation. But there is nothing in the record regarding defense counsel's meetings with Nelson or defense counsel's preparation.

Third, Nelson asserts that defense counsel's failure to present evidence that EM was under the influence of a drug known to cause paranoia and hallucinations was deficient performance. But the appellate record does not contain any evidence regarding the effects of cocaine or whatever drug EM consumed.

Fourth, Nelson asserts that defense counsel's failure to (1) establish at trial that EM suffered no defensive wounds, that EM was not treated for any injuries consistent with the photographic evidence showing blood on the apartment's floor, and that there was no blood on either his or EM's clothing; and (2) argue that this lack of evidence contradicted EM's assertion that they had fought for 10 minutes was deficient performance. But there is no evidence in the

appellate record regarding whether EM suffered or was treated for other injuries or whether there was blood on his or Nelson's clothing.

### 3. Failure to Impeach EM with 911 Call Statements

Nelson argues that defense counsel failed to impeach EM with statements he made during the 911 call that were inconsistent with his trial testimony. Nelson does not identify what specific statements or testimony to which he is referring. Because this SAG claim is too vague to properly inform us of the nature and occurrence of the claimed error, we cannot review it. RAP 10.10(c).

### 4. Blood Photographs

Nelson argues that defense counsel's failure to object to the admission of photographs showing blood on the apartment's floor was deficient performance. He contends that photographs showing the blood should not have been admitted because the alleged blood evidence was never tested to confirm that it was in fact blood or to determine the source of the blood.

The State presented three photographs of the apartment area where the altercation took place, and at least one of these photographs showed what appeared to be blood on the floor. Defense counsel did not object to these photographs, and the trial court admitted them. But Yocum also testified that he saw blood on the apartment floor, and Nelson does not argue that this testimony was improper.

Accordingly, even assuming, but not deciding, that defense counsel's failure to object to these photographs was deficient performance, Nelson does not establish prejudice because this evidence also was presented through Yocum's testimony. And there is no reasonable probability that the verdict would have been different if the photographs had not been admitted.

5.    Lack of Physical Injuries

Nelson also argues that defense counsel's failure to establish that Nelson had no injuries consistent with a 10 minute fight was deficient performance. But Nelson's girlfriend testified that when he returned home on the night of the incident she did not see any visible injuries or marks on his hands or face. And in closing argument defense counsel reminded the jury of this testimony. Accordingly, Nelson's claim that defense counsel did not present or address Nelson's lack of injuries is not supported by the record, and Nelson cannot establish deficient performance on this basis.

CONCLUSION

We affirm Nelson's convictions but reverse the trial court's same criminal conduct determination. We remand for the trial court to determine whether to apply the burglary antimerger statute and to strike the community custody supervision fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
GLASGOW, J.

_____
PRICE, J.