# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85684-7-I |
| Respondent, | |
| v. | ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |
| SHAWN LAMAR BELL, | |
| Appellant. | |

The respondent, State of Washington, has filed a motion for reconsideration of the opinion filed on February 5, 2024. The appellant, Shawn Bell, has filed an answer to the motion. The court has considered the motion and answer, and a majority of the panel has determined that the motion should be denied but the opinion should be withdrawn and a substitute opinion filed; now, therefore, it is

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on February 5, 2024 is withdrawn; and it is further

ORDERED that a substitute unpublished opinion shall be filed.

_____
Birk, J.

_____
Chung, J.

_____
Dwyer, J.

FILED
4/15/2024
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85684-7-I |
| Respondent, | |
| v. | DIVISION ONE |
| SHAWN LAMAR BELL, | UNPUBLISHED OPINION |
| Appellant. | |

BIRK, J. — Following two incidents at retail stores in Puyallup and Tacoma, the State charged Shawn Bell with robbery, assault, rape, attempted kidnapping, and burglary. A jury convicted Bell on all counts except attempted kidnapping. Bell appeals, asserting among other alleged errors that the trial court erred by allowing the State to exercise a peremptory challenge contrary to GR 37. We agree, and for this reason we reverse Bell's convictions and remand for a new trial. Bell also argues substantial evidence does not support his rape and burglary convictions. We hold that substantial evidence exists. We do not reach Bell's other assignments of error.

I

A

Bell's trial began March 7, 2022 with the following two and a half days dedicated to individual voir dire. The trial court then presided over general voir dire of the entire panel.

During general voir dire, the State asked juror 39, "How do you determine whether somebody is telling the truth? What do you look for?" Juror 39 responded, "Their body or eye contact, the way they speak, evidence and facts." Later, the State asked the prospective jurors as a group who had served on a criminal trial before and juror 39 answered affirmatively by raising his placard. Juror 39 stated his previous jury service occurred about four years before, and he did not think there were any law enforcement officers who testified at that trial.

Defense counsel spent time discussing the presumption of innocence with several jurors. After questioning another juror, defense counsel turned to juror 39 and asked, "Juror 39, what do you think?" Juror 39 responded, "I wasn't paying attention. I lost track. What was the question?" The following exchange then took place between defense counsel and juror 39:

> MR. TOLZIN: If I sit down, after I get [done] talking to you, and I don't say another word for the rest of this trial, what impact do you think that's going to have on the presumption of innocence for you?
>
> Would you think that's a con that my client did it?
>
> PROSPECTIVE JUROR: Like if the person kind of gave up?
>
> MR. TOLZIN: Yes, so would you hold that against my client?
>
> PROSPECTIVE JUROR: Yeah, because I wouldn't hear all of the information on everything.
>
> MR. TOLZIN: If I said a few words but he himself didn't say anything, would that be a problem for you?
>
> PROSPECTIVE JUROR: He might incriminate himself and put himself into something.

2

MR. TOLZIN: Do you think the fact that he doesn't say a word, that I make a decision that he isn't going to say anything, do you think that in any way incriminates him in this case?

PROSPECTIVE JUROR: Maybe he gives you the power to say that.

Neither party asked juror 39 any additional questions.

At the end of voir dire, the State exercised a peremptory challenge against juror 39. Bell objected under GR 37. The State responded indicating "the issue" it had with juror 39 was "the same as we had" with another juror, that in response to defense counsel's questioning juror 39 "kind of registered a stunned reaction and said, 'Sorry. I wasn't paying attention.' " The State attributed its concern to juror 39 "overtly" stating he was not paying attention. The trial court believed juror 39 to be a person of color and "[Juror 39's] comments that he made during the voir dire process, limited though they may be, seemed to demonstrate either a confusion about the circumstances that he was being questioned about or inattention." Defense counsel noted juror 39 was the only male person of color who was not numerically prohibited from being seated for the remainder of the trial.

GR 37(i) provides as follows:

The following reasons for peremptory challenges also have historically been associated with improper discrimination in jury selection in Washington State: allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact . . . . If any party intends to offer one of these reasons or a similar reason as the justification for a peremptory challenge, that party must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner. A lack of corroboration by the judge or opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge.

3

Citing GR 37(i), the court commented, "Juror 39's inattention was corroborated by his own acknowledgement, and he even said so. It's on the record." The trial court denied Bell's GR 37 challenge and granted the State's peremptory challenge to juror 39.

B

Bell argues the trial court erroneously granted the State's peremptory challenge to juror 39 over his GR 37 objection. We agree.

Washington appellate courts have applied de novo review under GR 37 when addressing whether an objective observer could conclude that race or ethnicity was a factor in a peremptory challenge. State v. Tesfasilasye, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022). In Tesfasilasye, the Supreme Court applied de novo review because "there were no actual findings of fact and none of the trial court's determinations apparently depended on an assessment of credibility." Id. Tesfasilasye left open the possibility that a standard of review other than de novo could apply in some GR 37 cases, but it did not define the circumstances in which this would be appropriate. Neither party asserts that we should depart from the decisional law applying de novo review.

The United States and Washington State Constitutions require an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; Tesfasilasye, 200 Wn.2d at 356. The parties and the jurors have the right to a trial process free from discrimination. Powers v. Ohio, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). The constitutions require nothing else, but tradition, statutes and court rules created peremptory challenges. Tesfasilasye, 200 Wn.2d at 356. Parties

may use these challenges to strike a limited number of otherwise qualified jurors without providing a reason. See RCW 4.44.130, .140; CrR 6.4(e). Peremptory challenges have a history of being used based on racial stereotypes. Tesfasilasye, 200 Wn.2d at 356. GR 37 was created to address this misuse of peremptory challenges and to overcome the shortcomings of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Tesfasilasye, 200 Wn.2d at 357.

Under GR 37(c), a party or the court may object to the use of a peremptory challenge to raise the issue of improper bias. Upon objection to the exercise of a peremptory challenge pursuant to the rule, the party exercising the challenge must articulate the reasons that the peremptory challenge was exercised. GR 37(d). Then, the trial court must evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances. GR 37(e). GR 37(g) outlines a nonexhaustive list of several circumstances the trial court should consider. State v. Listoe, 15 Wn. App. 2d 308, 321-22, 475 P.3d 534 (2020); State v. Lahman, 17 Wn. App. 2d 925, 936, 488 P.3d 881 (2021).

If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge must be denied, and the trial court should explain its ruling on the record. GR 37(e). The remedy for a GR 37 violation in a criminal case is reversal of the conviction. Tesfasilasye, 200 Wn.2d at 362; Lahman, 17 Wn. App. 2d at 938. This remedy applies regardless of the strength of the State's case or the hardship to victims or witnesses. Lahman, 17 Wn. App. 2d at 932.

The State concedes[1] it never gave notice of its intent to challenge juror 39 based on his being "inattentive," despite the command of the rule that a party wishing to rely on this or another ground listed in GR 37(i) "must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner."  In State v. Hillman, the defendant exercised a peremptory challenge against the lone Black person from the jury venire because defense counsel deemed the juror's demeanor as reflective of inattention and disinterest.  24 Wn. App. 2d 185, 189-90, 196, 519 P.3d 593 (2022).  The prosecutor agreed that the juror did not seem animated, but disagreed that the juror lacked interest in the proceeding and objected to the peremptory challenge under GR 37, which the trial court sustained.  Id. at 190.  The Hillman court noted defense counsel failed to bring his concerns regarding the juror's demeanor until after the close of juror questioning.  Id. at 196.  Citing GR 37(i), Hillman held defense counsel's failure to bring these concerns to the attention of the court and opposing counsel prior to the close of questioning invalidated the purported justification for the peremptory strike.  Id. at 196-97.

The present case is analogous.  GR 37(i) required the State to provide "reasonable notice" to the trial court and Bell "so [juror 39's] behavior [could] be verified and addressed in a timely manner."  While juror 39 verified his inattentiveness through his own admission, the State's failure to bring its concerns to the trial court's or defense counsel's attention until after the close of questioning

_____

[1] Wash. Court of Appeals oral argument, State v. Bell, No. 85684-7-I (Nov. 15, 2023), at 8 min., 33 sec. to 8 min., 59 sec., https://tvw.org/video/division-1-court-of-appeals-2023111168/.

prevented the behavior from being "addressed in a timely manner." GR 37(i). Neither Bell nor the trial court were afforded an opportunity to ask juror 39 about the length, extent, or significance of any inattentiveness. The State failed to follow the requirements of GR 37(i), and this error requires a new trial.

II

Although we reverse and remand because of the GR 37 violation, we address Bell's sufficiency of the evidence arguments as to his burglary and rape convictions.

Due process requires the State to prove " 'beyond a reasonable doubt . . . every fact necessary to constitute the crime with which [a defendant] is charged.' " State v. W.R., 181 Wn.2d 757, 762, 336 P.3d 1134 (2014) (alterations in original) (quoting In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)). Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt. State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). In a sufficiency of the evidence claim, the defendant admits the truth of the State's evidence and all inferences that reasonably can be drawn from that evidence. State v. Colquitt, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). "Nevertheless, the existence of a fact cannot rest upon guess, speculation, or conjecture." Id. Sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

A

Bell argues the State failed to prove that he entered or remained in the "Lovers" store unlawfully. We disagree.

1

The State put on evidence that on March 8, 2019, Carolyn Nance and Alisha Marquez were closing Lovers, a Puyallup adult store. Nance was at the front when someone entered the store. Nance went to greet the customer but "very quickly found out that it was not a customer," because the person had a mask on his face and "he was approaching me with his hands up and was coming for me." Nance described the mask as shiny, orange, "very streaky looking," and "was a costume mask, a Halloween mask." Nance observed the person wore "baggy, hooded clothes." Marquez described the mask as a "jack o'lantern mask." The masked man put his hands on Nance and backed her against a wall with his hands around her throat. With one hand on Nance's throat and another on the back of her neck, the masked man guided Nance to the cash register.

The masked man asked if Nance was alone in the store, and Nance said there was an associate in the back. After directing her to open the register and put the money in a bag he was carrying, Nance testified he "kind of [dragged] me back to the back of the store where the other associate was." Nance testified she did not feel like she had a choice to do this and was not in a safe situation because "he had put his hands on me." Marquez testified she was in the back of the store closing her register when she saw Nance come to the back with somebody in a mask holding her neck. The masked man instructed Nance and Marquez to put

the store's phones, the deposit that was being prepared, and their personal cell phones into his bag. On their way out, the masked man took several items from the store, including battery operated vibrators, performance enhancement pills, and dildos. When they reached the store entrance, the masked man said, " 'You're coming with me,' and [Marquez] said, 'No, the fuck she's not,' " then she grabbed Nance's arm and pulled her back. The masked man left.

Michelle Lund, a police administrative support specialist at Tacoma Police Department, testified that she heard about the Lovers store incident on the news. Lund watched Lovers store surveillance video the Puyallup Police Department posted on their Facebook page, and the suspect's orange, metallic-looking mask caught her attention. Together with the mask and the suspect's body size and type, Lund believed the suspect to be Bell.

Nance testified exhibit 91 was the mask the man wore. Exhibit 91 was obtained from execution of a search warrant at Bell's business.

2

"A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person." RCW 9A.52.020(1). A person "enters or remains unlawfully" in or on the premises when he or she is not then licensed, invited, or otherwise privileged to so enter. RCW 9A.52.010(2). "A license or privilege to enter or remain in a building which is only partly open to the public is

not a license or privilege to enter or remain in that part of a building which is not open to the public." Id.

The license to enter or remain may be limited as to time, place, or purpose and may be revoked. State v. Lambert, 199 Wn. App. 51, 73, 395 P.3d 1080 (2017). Depending on the "actual facts of the case," a limitation on or revocation of the privilege to be on the premises may be inferred from circumstances. State v. Collins, 110 Wn.2d 253, 255, 261, 751 P.2d 837 (1988) (defendant remained unlawfully on the premises, because he exceeded the scope of his invitation and committed crimes).

In Lambert, a jury found the defendant guilty of first degree burglary of the residences of his parents and grandparents. 199 Wn. App. at 68-69. Trial evidence showed the defendant entered his family's residences with permission, before attacking and killing his paternal grandfather and maternal grandfather. Id. at 56-58. The defendant argued his burglary convictions were supported by insufficient evidence because he did not enter or remain unlawfully in a family member's residence. Id. at 72. Lambert held, "A jury could also reasonably infer that any invitation to enter and remain in the house was revoked when Lambert attacked [his paternal grandfather]." Id. at 73. Viewing the evidence in the light most favorable to the State, a jury could reasonably infer the invitation to the defendant to enter the house was limited to a single purpose—to visit his grandfather. Id.

Bell relies on State v. Miller, in which the court reversed and dismissed a second degree burglary conviction because the defendant did not enter or remain

unlawfully in a car wash. 90 Wn. App. 720, 723, 730, 954 P.2d 925 (1998). The defendant entered a self-service car wash, washed his truck, and broke into several coin boxes in three wash bays. Id. at 723. The car wash, open for business 24 hours a day, consisted of wash bays with a roof, side walls, and no doors. Id. Miller reasoned it was immaterial whether the defendant formulated the intent to steal the contents of the coin boxes before he entered the car wash or after he was already present. Id. at 725. "Washington law does not provide that entry or remaining in a business open to the public is rendered unlawful by the defendant's intent to commit a crime." Id.

The defendant in Miller did not assault an employee, did not enter an employee-only area of the business, and did not prevent an employee from contacting law enforcement. Evidence taken in the light most favorable to the State showed Bell did all of these things at the Lovers store. Any license to enter was revoked when Bell committed an assault against Nance by grabbing her, placing his hands on her throat and neck, and forcing her to place store property into his bag. The evidence was sufficient to support a first degree burglary conviction.

B

Bell argues the evidence was insufficient to prove he committed second degree rape because the State could not prove forcible compulsion. We disagree.

1

The State put on evidence that in the early morning hours of March 11, 2019, Joseph Marco and B.C. were closing the Castle Megastore, an adult store

11

in Tacoma. Marco testified that after closing and exiting the store out the store's back door and into the loading area with B.C., "[p]retty immediately we saw somebody come from behind the dumpster and come towards us." Marco described the individual as wearing black sweats, a black hoodie pulled up, a backpack, and an orange mask that was "bright and shiny." B.C. testified the man was in all black and wore an orange, shiny, metallic mask. The masked man grabbed Marco by his collar, demanding to let him into the store. Marco lied and said he did not have store keys because he "didn't want this to go any further." The masked man punched Marco in the face, causing Marco's glasses to fly off so Marco "was pretty much disabled at that point in time."

B.C. testified they walked away from the street and lower down into the loading dock area. B.C. testified the masked man grabbed her t-shirt, brought her face close to his face, and told her that he "would fuck me in the parking lot, right there in the parking lot." Marco testified that after the masked man punched him, the masked man "basically said that he was going to fuck [B.C.] because he couldn't get in the store," and "[h]e was frustrated." Marco did not remember B.C. saying much, but he tried pleading with the masked man and said, " 'Please don't hurt us.' " Marco testified the masked man then said, " 'Suck my dick.' "

B.C. testified, "[The masked man] was going to make me suck him off. At that point he had put his hands on my shoulders and kind of pushed me down to the ground." B.C. clarified, "It was just he pushed me lightly." B.C. did not feel like she could run away because she "just didn't want to take the chance of not getting away" and did not feel she was able to just leave on her own. B.C. testified the

masked man "pulled down his pants, and he forced me to perform oral sex on him," and "[h]e forced his penis into my mouth. I had kind of stopped at one point, and he made the comment to suck it like I mean it." The masked man continued to force B.C. to perform oral sex "[b]y pressing himself in [her] mouth." Eventually the masked man stopped, pulled up his pants, and told B.C. and Marco to run and that he would be back the following night. At some point, the masked man demanded B.C.'s phone, she gave it to him, and he threw her phone in the street.

B.C. and Marco testified exhibit 91 was the mask the man wore that night.

On cross-examination, when asked, "[The man] never threatened you, right," B.C. responded, "Not with a weapon no." Other than when the man threatened "to F [her]," B.C. agreed the masked man did not "make any threats towards [her] at all the entire time."

Forensic scientist Jennifer Hayden completed a DNA analysis on oral swabs collected from B.C. during a sexual assault exam and testified it was 870 octillion times more likely the profile was the result of B.C. and Bell than B.C. and an unknown individual.

2

A person is guilty of second degree rape when the person engages in sexual intercourse with another person by forcible compulsion. RCW 9A.44.050(1)(a). "Forcible compulsion" means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped. RCW 9A.44.010(3).

13

The required physical force must have been force that was " 'directed at overcoming the victim's resistance and was more than that which is normally required to achieve penetration.' " State v. Gene, 20 Wn. App. 2d 211, 224, 499 P.3d 214 (2021) (quoting State v. McKnight, 54 Wn. App. 521, 528, 774 P.2d 532 (1989)). " 'Forcible compulsion is not the force inherent in any act of sexual touching, but rather is that used or threatened to overcome or prevent resistance by the [victim].' " Id. (alteration in original) (internal quotation marks omitted) (quoting State v. Corey, 181 Wn. App. 272, 277, 325 P.3d 250 (2014)). The resistance that forcible compulsion overcomes need not be physical resistance, but it must be reasonable resistance under the circumstances. Id. Whether the evidence establishes the element of resistance is a fact-sensitive determination based on the totality of the circumstances, including the victim's words and conduct. McKnight, 54 Wn. App. at 526.

A threat for purposes of forcible compulsion cannot be based solely on the victim's subjective reaction to particular conduct. State v. Weisberg, 65 Wn. App. 721, 725, 829 P.2d 252 (1992). "Threat" means to communicate, directly or indirectly the intent to "cause bodily injury in the future to the person threatened or to any other person." RCW 9A.04.110(28)(a). "[T]here must be some evidence from which the jury could infer that not only did [the victim] perceive a threat, but also that [the defendant] in some way communicated his intention to inflict physical injury in order to coerce compliance." Weisberg, 65 Wn. App. at 726.

14

Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences from the evidence, there is sufficient evidence in the record to prove forcible compulsion. B.C.'s testimony that the assailant grabbed her shirt, brought her towards him, and pushed B.C. to the ground, even "lightly," permits a jury to find force directed at overcoming the victim's resistance. Gene, 20 Wn. App. 2d at 224. B.C.'s testimony supports the inference that she resisted because the man "pushed" her to the ground. Further, before the man forced B.C. to perform oral sex on him, he grabbed Marco by the collar and punched him in the face, and, when he grabbed B.C. by her shirt and brought her close to his face he told her he "would fuck [her] in the parking lot, right there in the parking lot," and at some point took B.C.'s phone away to prevent her from contacting the police. And when B.C. paused while performing oral sex on the man, he told B.C. to "suck it like [you] mean it." A jury may conclude the man made a "threat" within the meaning of the statute because he "communicated his intention to inflict physical injury in order to coerce compliance" through his violent and coercive actions leading up to and during the rape. Weisberg, 65 Wn. App. at 726. The evidence was sufficient to support a second degree rape conviction.

III

In light of our disposition, we do not reach Bell's claims of error in his brief of appellant and his statement of additional grounds concerning a lesser degree instruction on third degree rape, seizure of his phone, ineffective assistance of counsel, DNA collection, alleged violation of Franks v. Delaware, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), alleged violation of Brady v.

15

Maryland, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), alleged appeals to racial bias in closing argument in violation of State v. Monday, 171 Wn.2d 667, 678, 257 P.3d 551 (2011), and sentencing error.

Reversed and remanded.

_Birk, J._

WE CONCUR:

_Chung, J._

_Dwyer, J._